Commonwealth *v.* McCoy, Appellant.

Argued January 14, 1960; reargued May 4, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*J. Charles Short,* with him *Israel Stiefel,* for appellant.

*Richard M. Rosenbleeth,* Assistant District Attorney, with him *Domenick Vitullo,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 29, 1960:

Frank McCoy, after trial, was convicted by a jury of murder in the first degree, with the penalty fixed at death. The court below denied a motion for a new trial and this appeal is from the judgment and sentence, imposed in accordance with the verdict.

That the facts warranted the finding of guilt returned by the jury is not questioned by counsel and an examination of the record definitely discloses all the essential ingredients of murder in the first degree. It is clear beyond question that the victim's death re-

sulted directly from violence inflicted upon him by the defendant while he was engaged in the perpetration of a robbery and that during the course thereof the defendant, according to the Commonwealth's witnesses, cruelly shot and killed the proprietor of a small business establishment, a man by whom he had previously been employed. However, basic prejudicial errors occurred during the trial which render a retrial necessary.

The trial judge, in part, said to the jury: "I say to you, if there is any doubt about this man's guilt, if there be any reasonable doubt about any fact upon which the ultimate verdict of guilt may rest, give him the benefit of that doubt and send him out that way; but if you have no doubt, and you find from all the evidence, beyond a reasonable doubt, that this is first degree murder, *in that a decent citizen was brought to his death without a chance perhaps to repent, by a bullet from a gun in the hands of a man whose reputation before you is one that is steeped in crime, vicious crime—and at the commission thereof, beating, striking and ill using, on a previous occasion*—you may then give consideration to that, and then, and then only, do you exercise the discretion the law not only gives you, but imposes upon you, to say whether or not in your judgment the penalty should be life imprisonment or death."

The evidence did not justify this characterization of the defendant as a "man whose reputation before you is one that is steeped in crime, vicious crime." The only previous criminal record disclosed is that the defendant in the year 1950, at the age of twenty-five years, plead guilty to the charge of armed robbery. One such conviction, even of so serious a nature, did not warrant the use of the words employed in the charge. But what is more important, the instruction above

quoted could not help but have the effect of causing the jury to consider the previous record of the defendant in determining his guilt on the present indictment, rather than of restricting its use to a determination of the penalty to be imposed after guilt of murder in the first degree had been first resolved. What influence this imprudent language had on the jury in arriving at its verdict as to the defendant's guilt is impossible to say. When this case was tried, Act of December 1, 1959, P. L. 1621, not being retroactive, did not apply: *Commonwealth v. Scoleri*, 399 Pa. 110, 160 A. 2d 215 (1960). But, even as of then, the sole and only purpose for the admission into evidence in this case of the record of the defendant's prior convictions was to aid the jury in fixing the penalty, *after* the jury found the defendant guilty of murder in the first degree: *Commonwealth v. DePofi*, 362 Pa. 229, 66 A. 2d 649 (1949); *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733 (1953). Its purpose and scope were strictly limited and it was most incumbent upon the trial judge in such an instance to make certain that the jury clearly so understood. For the instructions to lead to the impression, even to the slightest degree, that this evidence should influence the jury's determination of the defendant's guilt was substantial and prejudicial error.

In this case, it also appears to us that the trial judge took an unduly active participation in the trial of the case. Numerous pointed questions, directed to the defendant from the bench, exhibited an extended and aggressive cross-examination not conducive to a fair trial or proper judicial demeanor. While, "It is always the right and sometimes the duty of a trial judge to interrogate witnesses, . . . questioning from the bench should not show bias or feeling nor be unduly protracted": *Commonwealth v. Watts*, 358 Pa. 92, 96, 56 A. 2d 81 (1948); also, *Commonwealth v. Myma*, 278

Pa. 505, 508, 123 Atl. 486 (1924). We can well appreciate the high sense of moral indignation the presiding jurist experienced in listening to the account of the heinous crime involved. Yet, under such circumstances, it is more imperative than ever that one charged with such a great responsibility should preside with calmness and equanimity to make sure that the right of the defendant to a fair and impartial trial is constantly kept inviolate.

Judgment reversed, with a venire facias de novo.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Frank McCoy, the defendant in this case, was indicted and tried for the murder of Gaetano Sabelli and was found guilty of murder in the first degree, the jury fixing the penalty at death. The defendant has appealed for a new trial, urging trial errors.

On the morning of July 1, 1957, Frank McCoy, armed with a revolver, and accompanied by a James Allen, entered the establishment of Gaetano Sabelli, who operated an importing business at 1000 South Ninth Street, Philadelphia. While McCoy was engaged in committing a robbery, which was the purpose of his visit, Mr. Sabelli came into the store and McCoy shot him. The defendant testified that as he held his revolver to the back of Sabelli, the latter suddenly turned and, in turning, caused McCoy's revolver to be accidentally discharged.

I agree wholeheartedly with the Majority of this Court that the defendant is entitled to a new trial, but I dissent from the Majority Opinion announcing that decision. I believe, and I make this statement most respectfully, that the Majority Opinion is inadequate.

An appellate decision which reverses a judgment of a lower court and remands the cause for a new trial should take pains to point out wherein the Trial Court erred so that it may not commit the same errors again.

This case is a very serious and solemn one since the verdict carried with it the death penalty. The defendant in his appeal protests that the trial judge unduly and actively participated in the trial and that this undue participation contributed heavily toward the death verdict. If the judge did inordinately become involved in the trial to the prejudice of the defendant's right to a fair trial, he may have come into conflict with what Justice KEPHART (later Chief Justice) said in the case of *Commonwealth v. Myma*, 278 Pa. 505, 508: *"The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved.* The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. *An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table.* To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. *It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence.* Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them." (Emphasis supplied.)

Did the Trial Judge in the case at bar enter into the trial as an advocate? The Majority Opinion hints that he may have. It says: "In this case it also appears

to us that the trial judge took an unduly active participation in the trial of the case. Numerous pointed questions, directed to the defendant from the bench, exhibited an extended and aggressive cross-examination not conducive to a fair trial or proper judicial demeanor."

What were those questions? Unless the Trial Judge knows which questions were improper, he may ask them again and, in the event of another guilty verdict, we may have to remand the case once more. I believe that correct procedure requires and justice demands that an appellate court chart a course for a new trial which will mark the dangerous reefs and perilous rocks on which the ship of a fair trial foundered in the first voyage.

This charting should not be done in the spirit of censuring the judge but with the object of illuminating the waters over which he must guide the craft of the new trial. It is my impression, as I read the record in this case, that at times the Trial Judge forgot he was wearing a robe and saw himself back in the lists as a battling district attorney determined to uphold the rights of the Commonwealth and to protect society from the defendant. But the courtroom already had a district attorney and nothing in the record would suggest that he was not discharging his responsibilities ably and conscientiously. Nevertheless, when he had finished with his cross-examination, the Trial Judge said: "I think this case has not been developed completely, and I take it it is my duty to develop it further." With this announcement, he practically shunted the district attorney aside, loosened his robe, and took over an active prosecution of the case.

I want to make it clear at the outset of my discussion that I believe a judge *should* ask questions in order to clarify issues, remove ambiguities, and protect the rights of parties and witnesses and uphold the

dignity of the proceedings. As justly stated by Justice (later Chief Justice) STERN in the case of *Commonwealth v. Watts*, 358 Pa. 92: "It is always the right and sometimes the duty of a trial judge to interrogate witnesses. . ." The able and experienced Justice, however, added this limitation: "although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted."

I believe that the very first question put by the Trial Judge in this case, when he took over the cross-examination, showed bias: "You apparently know how to handle a gun or a revolver, don't you? You know about revolvers, don't you?"

He then put a series of questions which seemed more like accusations than inquiries. And it is a matter of reasonable likelihood that an accusation coming from the determined lips of the judge may well, in the eyes and ears of a devoted jury, proclaim that the judge knows that the answers to the questions should be "Yes", regardless of how the defendant might reply. The following questions are typical of the judge's interrogation: "You planned this robbery, didn't you?" "Two weeks before this happened you had planned it with a man by the name of Allen; isn't that right?" "To rob your former employer?" "He (his accomplice) knew the place because you sort of took him down there and looked at it, didn't you?" "You told him before, so that it was you who was the captain of this enterprise, isn't that right?" "Why didn't you order him in the back without the gun? You smile. Can you answer that question?" "Did he attempt to use any judo or any technique of handling bales, of which you know he had some prowess?" "He raised your arm, and there is the gun practically in his face?"

To most of these questions, the defendant answered in the negative, but, as above stated, the negatives

would have little weight in the face of the obviously determined opposition of the judge.

Another part of the judge's examination, with its repetitive accusations and subtle sarcasms would make satisfactory reading if the prosecuting attorney were putting the questions. When, however, one realizes that it was the judge who was doing the interrogating, one cannot help wondering if the jury might not have been unduly influenced against the defendant because of the very fact that the judge was the questioner. Thus: "Q. Now, you did not intend to hurt anybody, did you? A. No, sir. Q. Tell me why you took that loaded gun with you? A. Because it was a way of persuasion. Q. It was a way of persuasion? A. That they would be afraid of the gun just to see it. Q. In other words, you took the gun to persuade, didn't you? Did you? A. Yes, sir. Q. You knew a gun is a lethal, deadly instrument, didn't you? A. Yes. Q. Notwithstanding your knowledge of that, you took that gun to persuade; is that correct? A. Yes, sir. Q. To persuade to what end, to rob? A. Yes, sir. Q. To persuade to take the money, and you used that gun in this business, didn't you? A. Your Honor, the expression 'this business' is rather— THE COURT: I am trying to use innocuous terms. All right, I will change it. BY THE COURT: Q. You used that gun in the stickup, didn't you? A. Yes, sir. Q. You did. You used it on two girls, didn't you? A. Yes, sir. Q. And then when those girls responded to your demands, you put the gun back in your pocket, didn't you? A. Yes, sir."

The judge's phrase "responded to your demands," was a most unfortunate choice of words because there was nothing to support what the words might insinuate. And the judge's expression "this business" could have suggested that the defendant had undertaken robbery and murder as a business. Even the un-literate

defendant objected to the phrase, as indeed he had the right to object.

Another danger attendant upon a judge's extended and aggressive cross-examination resides in the fact that there is the possibility the judge may carry the mood, temper and irony of his cross-examination into his charge. During the judge's examination of McCoy he asked McCoy how Sabelli had raised his arms during the encounter. The defendant asked if he could demonstrate the way it happened, and the judge dryly observed: "This is your day. You demonstrate it to that jury."

Then, in charging the jury, the judge sardonically recalled the defendant's demonstration as follows: "The defendant asked for a court officer to demonstrate what happened. I hope you witnessed every maneuver of that demonstration. Could it have happened the way he said? Did he portray it consonant with his description of what happened? You saw it just as well as I did, and from a better angle. Was that the case? His plea is not guilty, but is he saying by way of confession, I did this thing but I did not intend to kill him? He does not have to intend if it is in the commission or perpetration of a holdup."

This was an argument for conviction—coming from the Bench. Of course, the judge has the right to express his views, but he must make it clear that the jury is not bound by his views. And here we come to that particular error in the trial which was irremediable, except by granting a new trial.

In *Commonwealth v. Nafus,* 303 Pa. 418, 420, this Court said: "The court should not attempt to influence the jury in determining the guilt of the accused or the degree of his crime. Nor may the court influence the jury in the exercise of the discretion which is lodged solely in them."

In *Commonwealth v. Trunk*, 311 Pa. 555, we reversed a verdict of guilty because the Judge's charge was not impartial. We said: "The tone and language of the charge in many parts was that of an advocate for the prosecution, and, therefore, not such a judicial presentation of the case as the defendants were entitled to."

In *Monier v. Phila. Rap. Transit. Co.*, 227 Pa. 273, 275, Justice MESTREZAT, speaking for a unanimous Court, said: "The trial judge may express his views on the evidence in a proper and dispassionate manner so long as he leaves the jury entirely free to consider the evidence and determine the facts. He may not, however, by the use of violent and impassioned language discuss the parties, the witnesses, or the evidence in such manner as to prevent a calm and impartial consideration of the case by the jury. A litigant has a right to a trial by a fair and impartial jury whose consideration of his cause is not influenced by any language of the court which would create resentment or prejudice against him."

If this is true in a civil case, with what greater impact should it apply in a criminal case, and especially one where life and death are involved? Whether the charge delivered in the case at bar falls within the interdicted classes above indicated will now be seen.

For the purpose of enlightening the jury in the event it found the defendant guilty of murder in the first degree, the Commonwealth introduced in evidence a court record which showed that in July, 1950, the defendant had pleaded guilty to a charge of robbery, burglary, and intent to rob. When this record was read in open court, the Trial Judge, in exemplary fashion, explained to the jury that the record was not to be considered unless they convicted the defendant of murder in the first degree when they could then take it into consideration in arriving at the proper penalty.

In his charge to the jury, the Trial Judge repeated this proper instruction. He also explained to the jury that they were the absolute judges of the facts. He stated more than once that although he would recall the evidence to them so that they might thoroughly understand the issue which they were to decide, they were not to be bound by his recollection. Specifically he said: "I will also summarize the facts, but, again, I say to you out of caution that if I give an opinion or say something which tends to indicate something which in your mind you did not believe before, or with which you are not in accord, you must disregard what I say and accept your recollection, your deduction, your inferences from the facts, especially if it is a fact or conclusion, or a combination of fact which sum up to a determination which may indicate guilt. We are careful of the rights of people charged with crime. We spend thousands of dollars, and it is your money, to protect those rights."

He instructed the jury on the presumption of innocence, on the burden to be carried by the Commonwealth in proving the defendant guilty beyond a reasonable doubt and that this burden applied to every phase of the case. He said he would not express any opinion as to the possible guilt of the defendant: "Let me say to you with respect to this and any other case, a Court has the right to give you an opinion as to the guilt or innocence of a defendant—perhaps not a right, but a privilege—but I won't do that in this case."

However, after these various disclaimers of partisanship, the judge ended his charge with a vigorous exhortation which practically told the jury he expected of them a verdict of guilty with the death penalty. The last words in his charge were as follows: "I say to you, if there is any doubt about this man's guilt, if there be any reasonable doubt about any fact upon which the

ultimate verdict of guilt may rest, give him the benefit of that doubt and send him out that way; but if you have no doubt, and you find from all the evidence, beyond a reasonable doubt, that this is first degree murder, *in that a decent citizen was brought to his death without a chance perhaps to repent, by a bullet from a gun in the hands of a man whose reputation before you is one that is steeped in crime, vicious crime—and at the commission thereof, beating, striking and ill using, on a previous occasion*—you may then give consideration to that, and then, and then only, do you exercise the discretion the law not only gives you, but imposes upon you, to say whether or not in your judgment the penalty should be life imprisonment or death.

"It is a grave responsibility, members of the jury, and may God help you as you deliberate, to bring in a proper verdict." (Emphasis supplied.)

There was no evidence in the case that McCoy was a man with a reputation of one "steeped in crime, vicious crime." The only previous record, as already stated, showed that on one occasion McCoy had pleaded guilty to one offense. The court clerk, in reading from the indictment of that previous offense, explained: "On bill of indictment July, 1950, bill 292, Commonwealth vs. Frank McCoy, 1217 South 19th Street, the charge is, the first count, assault, being armed with an offensive weapon, with intent to rob; second count, robbery, being armed with an offensive weapon; third count, robbery and at the commission thereof, beating, striking and ill using; fourth count, committing a crime of violence while being armed with a firearm."*

---

*Two indictments were introduced. The court asked: "Two bills arising over the same offense?" The clerk answered: "That's right."

There was no evidence as to what the "beating, striking and ill using" consisted of. There was nothing to suggest that the words were anything more than the tautology often employed in an indictment to cover every possible angle of evidence which might arise during the trial. However, in the mouth of the judge the words sounded like the narrative of facts of which he had personal or at least official knowledge.

When McCoy committed the single robbery referred to in the past record, he was 25 years of age. Of course, even one robbery could demonstrate the offender to be a desperate criminal but, in the absence of any elucidating facts as to the details and atmosphere of the prior offense, and none were produced, the judge casts explosive words in shallow water when he tells the jury that one offense of the character mentioned and at the age specified brands the guilty person with the reputation of one "steeped in crime, vicious crime."

What was the effect of this exaggerated language on the jury? It is possible the jury would have found the defendant guilty of first degree murder and fixed the penalty at death, even without the impassioned exhortation of the trial judge, but it is also possible the jury might have fixed the penalty at life imprisonment or even have returned a second degree murder verdict, if the judge had not sent them out to deliberate with a bitter characterization ringing in their ears, a characterization which made the defendant a man steeped in crime who had killed a "decent citizen" "without a chance to repent."

All that the judge had said before, about giving the jury absolute discretion, was wiped out by his closing remarks.

In any serious discussion, it is the recommendation, admonition or advice last spoken which controls. Army staff officers would be guided entirely by what their

general told them in the final minute of a lecture, even if this contradicted what he had said to them during the previous hour.

Did the judge mean, when he told the jury that Sabelli had not had a chance to repent that if McCoy had given Sabelli a chance to repent of his life's sins, McCoy's crime would somehow have been reduced in seriousness, perhaps to murder in the second degree? Suppose that McCoy had informed Sabelli that he was going to shoot him at the end of an hour and that in the meantime Sabelli could pray for forgiveness of his sins, would this hour's reprieve have entitled McCoy to some special consideration at the hands of the jury? The judge informed the jury that Sabelli was a "decent citizen," which, of course, he was, but would the criminality of McCoy's act have been less than murder if he had shot a helpless "indecent citizen"?

In *Commonwealth v. Cater*, 396 Pa. 172, 178, Justice COHEN, speaking for the Court in a capital case, said that it should be "equally clear that the penalty of death is not to be pronounced routinely in cases of first degree murder; solemn deliberation and careful analysis should precede the determination to make use of this penalty so that life will not be taken needlessly." In that case the determination of the penalty devolved on the three judges who heard the evidence on a plea of guilty, but the "solemn deliberation" referred to is no less required when the determination of the penalty is left to the jury. And it is a question whether that solemn deliberation is not disturbed when the presiding judge informs the jury in vigorous fashion of the brutality of killing a decent citizen without a chance to repent.

What did the judge's impassioned utterance in this respect add to the law he was conveying to the jury? The judge's statement formed no part of the instruc-

tion, it enlightened the jury on no occult phase of the case, it opened up no avenue of thought on the "solemn deliberation" which was the jury's duty; its effect could only be to inflame the passions of the jury against the man whose life they had in their hands to adjudge.

No one knows how the jury arrived at its assessment of the death penalty, but the defendant has the right to argue that while finding him guilty of first degree murder, the jury might have fixed the punishment at life imprisonment had it not been for the judge's remarks here under discussion. It can well be that as the jury wavered between the decision of death and that of life imprisonment, the judge's speech of exhortation became the extra weight thrown into the scales which decided the jury to return a verdict of death. If this be true, the defendant did not receive a fair trial. If there be doubt as to whether the remark moved the jury toward the death verdict, the doubt should be resolved in favor of the defendant. No one can say with certainty that the judge's remarks did *not* influence the jury in favor of the death penalty. The judge said further: "This crime is murder. A life has been taken. It is an arrogant challenge to the Almightly purpose to take a life. So, with that in mind, and I might say I noted that in one of the speeches in the summation by counsel for the defense there was really in the whole tapestry of his argument a magnificent chord of spirituality, which was valid for him to say to you. I want you to take even that and give it the consideration to which it is entitled, and at the same time to make your determination, not on the basis of any emotion, but having in mind the laws of Pennsylvania, and having in mind the crime that was committed here, and having finally in mind *the type of person who committed that crime.*" (Emphasis supplied.)

In the whole overture of the judge's charge there was the ever-recurring chord which sounded a knell of doom to the defendant. Although the court frequently told the jury that they were the exclusive judges of the fact, there ran through the entire charge an argumentative strain of hostility to the defendant's case. The charge as a whole seems more like a prosecutor's argument rather than an impartial view of the facts with a dispassionate statement of the law.

In defining the malice which is a sine qua non of the charge of murder the judge said: "So that if a man sets out to commit a robbery or burglary, is that done because of a depraved heart? Is that done because of a reckless disregard for the rights of other people? Is that done because of a depraved disposition? Wouldn't you think it was?"

In describing the defendant to the jury he referred to him as "a burglar, a robber, a thief."

The judge seemed to go out of his way to paint pictures which would incite piteous sympathy for the decedent and thereby provoke indignation and bitterness in the jury's mind against the defendant. In describing the proof required to establish corpus delicti he said: "You must find under that testimony that the son saw his father's body at the morgue that same day; he saw a dead man, a cadaver, lying on a slab in the morgue, whom in his lifetime he had known as his father, Gaetano Sabelli."

One can comprehend how a district attorney, whipped into a fine frenzy of resentment over a particularly brutal crime, could, in a burst of forensic denunciation, picture to the jury the misery the defendant has wrought by inviting to their attention the grieving widow and weeping children and by pointing rhetorically to the snow-covered grave in the cemetery. One can comprehend this in a prosecuting attorney who

must combat the equally argent appeals to the jury on the part of his adversary, the defense attorney, but it is not easy to understand why a judge, whose obligation it is to allay passions and bring the jury to a calm and stoical analysis of the facts in the case, would stir the emotions of the jury by taking them on a tour of the cadaver-strewn morgue and dramatically point to the slab on which lies the earthly remains of the man who was done to death by the defendant at the bar. The judge's description was colorful and poignant, but not in keeping with his responsibility to make every endeavor to keep the scales of justice on an even balance so that the jury might reach its awesome decision unaffected by judicial words which tug at their heartstrings or stir the well-springs of rancor and vindictiveness.

I have said that I dissent from the Majority Opinion because it is inadequate and I repeat that I say this respectfully. In that inadequacy I would point out that it said nothing about other errors committed by the trial judge and which he may repeat unless they are called to his attention. Adverting to the fact that the defendant left the jurisdiction after the killing which occurred on July 1, 1957, the trial judge said: "Then the conclusive chapter is here. What happened after that? Why do people fly away? Why do they conceal themselves? There is a rule of law with regard to flight, and the rule of law is that when a crime has been committed, and the person accused thereof knows he is accused, and then flees or conceals himself, such conduct is evidence of a consciousness of his own guilt; however, that standing alone may not mean anything, but in connection with other proof it creates a basis from which guilt may be inferred."

This overstates the matter. There is no *rule of law* that when a person accused of crime leaves the juris-

diction, his departure is evidence of consciousness of guilt. Flight is a circumstance which may be considered by the jury in determining whether the defendant is guilty. In *Com. v. DeFelippis,* 245 Pa. 612, 617, we affirmed that portion of the trial judge's charge which read: " 'Flight or concealment, therefore, gentlemen, is only a circumstance for your consideration, together with all other circumstances, in determining the degree of guilt, if any.' "

In *Com. v. Romanic,* 311 Pa. 415, 421, we said: "Defendant also complains that the court failed to instruct the jury on the law of flight. That defendant's flight raised no presumption of guilt was stated in affirmance of one of defendant's points for charge, and the learned trial judge properly added that the fact of flight was a circumstance to be taken into consideration by the jury." It is conceivable that a person accused of crime might leave a jurisdiction for reasons other than acknowledgment of guilt. An unexplained departure, however, could raise unfavorable inferences against the defendant, and it is for the jury to determine in the event an explanation is offered, whether the explanation satisfies the norms of truth and reliability.

After charging on flight, the judge again reverted to the role of prosecutor and exhorted to the jury: "Was he panicky because he had brought to dust a Divinely instituted image, or was he panicky because of his own plight? They are things for you to consider. Was he panicky when he went to New York, and why did he go? Was he panicky as a result of the wrong he did, or was it occasioned by the fear for his own future? How do people act? Was he panicky when he went to Chicago and took up with another girl? Was he panicky, and was he the captain, after shooting this man in the face, if he did that—I do not say that he did—when he shortchanged his confederates on the money?

Who was the captain? Who divided the spoils? Who was the motivating person? Who motivated this action, and *what kind of man is he that you are dealing with?*" (Emphasis supplied.)

This was not a judicial charge in content or in delivery. It was a ringing litany of invocations to disbelieve and discredit the defendant. And it is to be noted that in the last clause the judge struck again the familiar chord of "What kind of man" are you "dealing with?" And since it is upon the kind of man the jury is dealing with that the jury assesses death or life imprisonment (after the verdict of first degree murder is reached), the judge's heaping of contempt upon the defendant could only mean he was urging them to assess the ultimate penalty.

I would also direct attention to the judge's statement: "The burden rests upon the Commonwealth to convince you of the guilt of the defendant, and all facts upon which that guilt is dependent must be believed beyond a reasonable doubt and *a fair preponderance of the evidence.*" (Emphasis supplied.)

Evidence which must convince beyond a reasonable doubt cannot be equated with "a fair preponderance of the evidence." A fair preponderance means a slight tilting of the scales in favor of one side over the other. That is not the test in a criminal case. The evidence of the Commonwealth must convince beyond a reasonable doubt in every phase of the prosecution.

It was not a slip of the tongue which caused the judge to equate reasonable doubt with a fair preponderance of evidence because he went on, immediately after the equation, to describe preponderance. He said: "Now, what is meant by preponderance? Normally, persons think that preponderance means more evidence. It does not. It means more credible evidence on one side than on the other."

But on the matter of proving guilt in a criminal case, preponderance of evidence has no place at all. The Commonwealth must prove beyond a reasonable doubt every phase of the case moving toward establishment of guilt.

If it should be said that my observations on the trial judge's errors seem harsh, I wish to state that I do not regard them to be so. I can understand that the trial judge was probably very indignant over the heinous crime of which he believed the defendant to be the ostensible author, but it was not for him to prosecute the case, decide the case, and fix the penalty. His great responsibility in the case was to see that the rights of the Commonwealth and the rights of the defendant were not imposed upon, and, in holding the scales of justice even, he had a duty to exercise formidable restraint and maintain an Olympian equanimity, leaving it entirely to the constitutional triers of the facts to announce what seemed to be self-evident.

Our system of jurisprudence is founded on precedent, and an attitude which seems unobjectionable in a case involving great probability of guilt could become the means of convicting an innocent person where the proof of guilt is not so overwhelming. The trial of even the most depraved criminal must be conducted with the same punctilious protection of constitutional rights as the trial of the highest dignitary of a state. This must be so if we intend that every trial shall become part of the great parapet of protection against victimization of the innocent. Thus, to allow the remarks and the attitude of the judge in this case to go unnoticed might be to invite repetition of that language and attitude in other cases, and, in time, neutrality in a judge would be a matter of memory and not of living reality.

A judge's impartiality should be real and not merely apparent, it should be objective and not abstract, it

should be positive and not negative. And, above all, it should be constant, for of what use is it for one to exercise the greatest care in carrying a very valuable and fragile vase up a long flight of stairs, if he carelessly drops it on the last step?

DISSENTING OPINION BY MR. JUSTICE BELL:

This is still another case where a new trial is granted to a man who committed a cruel murder without the slightest or remotest excuse, provocation or justification. This terrible killing not only occurred during the course of a robbery but in my judgment was willful, deliberate and premeditated. The jury found defendant guilty of murder in the first degree and fixed the penalty at death.

The trial Judge was so incensed by this atrocious crime that he referred to defendant as "a man whose reputation before you is one that is steeped in crime, vicious crime . . ."—an armed robbery in which he beat, struck and ill used his victim. We are all agreed that the trial Judge should not have used such language to describe defendant's previous record, but the jury had that record before them, namely a single armed robbery and at the commission thereof beating and striking his victim, and even the trial Judge obviously limited his intemperate words to that one previous crime. We note that the Court throughout his charge stated that it was the jury's recollection and determination of the facts which must govern and not what the Judge's recollection was or what his view of any part of the evidence was. He emphasized that defendant is "clothed with the presumption of innocence"; and he *repeatedly* told the jury that it was incumbent upon the Commonwealth to convince them beyond a reasonable doubt of

defendant's guilt before he could be convicted of murder or of any crime. That the jury could not have misunderstood the purposes and limitation of defendant's prior record is clear from the following:

"THE COURT: Members of the jury, the evidence about to be introduced now is being introduced over the objection of the defendant. It is the sort of evidence *you must pay no attention to at all unless you come to a verdict of murder in the first degree.\** The evidence now has to do with penalty. The Act of 1925 says that the jury by its verdict of first degree fixes the penalty, and because of that situation, if the jury finds a verdict of first degree, it fixes the penalty in succession, without any break in their deliberations. That is the sort of evidence that normally would not be admissible against a person, and I say to you now *in as emphatic words as I can command, this evidence must not have any influence on your verdict.* It is evidence which has to do with the criminal record of this man. It must not influence you, because this man comes to the bar of the court clothed with the presumption of innocence so far as this case is concerned, and the Commonwealth must overcome that presumption by credible evidence, and this kind of evidence is not the evidence that can overcome that presumption or play any part in overcoming that presumption.

"You may say, then, what is the purpose of this? The purpose of it is so that when you come to the matter of penalty, *and only when you come to the matter of penalty,* if you find a verdict of murder in the first degree, then you will give this evidence consideration, because you must know what kind of person you are dealing with. Our appellate courts take a dim view of this kind of evidence. They believe in good judgment that this evidence has a tendency to induce or make a

---

\* Italics throughout, ours.

verdict of first degree murder where otherwise there would not be one; and thus it is I say to you now, from the body politic of our people, with good judgment, intelligent citizens, and I must reiterate this again in my charge, perhaps in other language, but with the same import and the same end, *you must not give any regard to this testimony* unless you find a verdict of murder in the first degree, and then for the first time. In other words, *this must have absolutely no bearing with you. This testimony must not enter into your processes of reasoning as to the matter of guilt.* You are concerned with this evidence if you do find a verdict of murder in the first degree, and you then come to the matter of penalty."

In the Court's charge to the jury the Judge said: "Now, you have before you *if you come to that point,* the record of this defendant, the record of a conviction for a crime of violence, being armed with an offensive weapon, on a previous occasion; robbery, and at the commission thereof, beating, striking and ill using.

. . .

"I say to you, *if there is any doubt about this man's guilt,*\* if there be any reasonable doubt about any fact upon which the ultimate verdict of guilt may rest, give him the benefit of that doubt and send him out that way; but if you have no doubt, and you find from all the evidence, beyond a reasonable doubt, that this is first degree murder, in that a decent citizen was brought to his death without a chance perhaps to repent, by a bullet from a gun in the hands of a man whose reputation before you is one that is steeped in crime, vicious crime—and at the commission thereof, beating, striking and ill using, on a previous occasion—*you may then* give consideration to that, *and then, and then only,* do you exercise the discretion the law not only

---

\* Erroneous and unfair to the Commonwealth.

gives you, but imposes upon you, to say whether or not in your judgment the penalty should be life imprisonment or death."

It is hornbook law that the fairness of a charge must be considered as a whole and not by one or more isolated excerpts. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Donough,* 377 Pa. 46, 103 A. 2d 694; *Commonwealth v. Patskin,* 372 Pa. 402, 93 A. 2d 704.

Defendant was represented by two experienced counsel. One of them was a member of the bar for over 25 years and the other for over 30 years. They took no exception whatever to the Court's charge. Even if an exception had been taken to the charge, it reaches only basic and fundamental errors: *Commonwealth v. Smith,* 374 Pa. 220, 225, 97 A. 2d 25; *James v. Ferguson et al.,* 401 Pa. 92, 162 A. 2d 690; *Luterman v. Philadelphia,* 396 Pa. 301, 152 A. 2d 464; *Lyons v. Wargo,* 386 Pa. 482, 126 A. 2d 411; *McDonald v. Ferrebee,* 366 Pa. 543, 79 A. 2d 232; and *Commonwealth v. Greevy,* 271 Pa. 95, 114 A. 511; 11 P.L.E., Criminal Law §690.

Language in a cold record sometimes appears to have a different meaning or connotation than it had in the atmosphere of the trial, and if it were as harmful as the majority of this Court believe, experienced counsel would certainly have objected thereto and the Court could have corrected its error. Justice is not a one way street—it should protect the law abiding community as well as the criminal. Substantial justice has been rendered in this case and the trial Judge's error was not only harmless but was undoubtedly waived.

With reference to the trial Judge's expression of feeling, I consider it natural and justifiable and certainly no cause for reversal.

For these reasons I would affirm the judgment.