375 A.2d 1292
**COMMONWEALTH of Pennsylvania**
v.
**Willard Lester ENGLAND.**

Supreme Court of Pennsylvania.

Argued Jan. 17, 1975.

Decided July 8, 1977.

2

4

R. Barclay Surrick, Asst. Public Defender, David E. Auerbach, Media, for appellant.

John M. Kenney, John G. Siegle, Asst. Dist. Attys., Media, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

In February, 1973, appellant was convicted of murder of the first degree in connection with the death of William Ricky Green in the City of Chester on January 24,

**6**

1971. Motions for a new trial and in arrest of judgment were argued, denied and appellant was sentenced to life imprisonment. This appeal followed.[1]

Our attention is directed to several assignments of error which appellant contends compel the award of a new trial. Finding no merit in the issues advanced we now affirm the judgment of sentence.

Initially, appellant maintains that the trial court erred in refusing to permit defense counsel on voir dire to ask prospective jurors the following question: "Do you agree with the legal principal [sic] that the defendant has no obligation to prove, or disprove, any fact, but may remain silent." Appellant argues that since he chose not to take the witness stand in his own behalf it was of particular importance that the venirepersons be examined as to their personal agreement with the constitutional right to remain silent and their willingness to apply it in this case.

██ The single goal in permitting the questioning of prospective jurors is to provide the accused with a "competent, fair, impartial and unprejudiced jury." *Commonwealth v. McGrew,* 375 Pa. 518, 525, 100 A.2d 467, 470 (1953); *see also, Commonwealth v. Dukes,* 460 Pa. 180, 186, 331 A.2d 478, 481 (1975); *Commonwealth v. Biebighauser,* 450 Pa. 336, 345, 300 A.2d 70, 75 (1973); U.S.Const. amends., VI, XIV; Pa.Const. art. I, §§ 6, 9. Voir dire examination is not intended to provide a defendant with a better basis upon which to utilize his peremptory challenges:

Lopinson also contends that the scope of his voir dire examination of the prospective jurors was unduly limited. An examination of the record disclosing the extent of the examination allowed completely refutes this position. Moreover, it is manifestly premised

1. This direct appeal is brought pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1976–77).

upon the mistaken belief that the purpose of the voir dire examination is to provide a defendant with a better basis upon which to utilize his peremptory challenges. This is not so. As stated by President Judge Rice in *Commonwealth v. Brown*, 23 Pa.Super. 470, at 498 (1903): "[T]he right of peremptory challenge is not of itself a right to select but a right to reject jurors." Accord *Commonwealth v. McGrew*, 375 Pa. 518, 525, 100 A.2d 467, 470 (1953); and *Commonwealth v. Morgan*, 280 Pa. 67, 71, 124 A. 339, 340 (1924). *Commonwealth v. Lopinson*, 427 Pa. 284, 297, 234 A.2d 552, 560 (1967), cert. den., 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 963 (1973) (footnote omitted). *See also, Commonwealth v. Biebighauser, supra,* 450 Pa. at 347, 300 A.2d at 75.

■ Thus, although latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack of qualifications and "whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence." *Commonwealth v. Lopinson, supra* 427 Pa. at 298, 234 A.2d at 561; see also *Commonwealth v. Martin,* 465 Pa. 134, 158, 348 A.2d 391, 403 (1975); *Commonwealth v. Ravenell,* 448 Pa. 162, 175, 292 A.2d 365, 371–72 (1972); *Commonwealth v. Hoss,* 445 Pa. 98, 107, 283 A.2d 58, 63 (1971). In ascertaining whether the juror has a "fixed opinion" as to guilt or innocence or whether he or she can be fair and impartial and set aside any harmful prejudices, *Commonwealth v. Martinolich,* 456 Pa. 136, 147–48, 318 A.2d 680, 686–87 (1974), we have considered certain types of questions irrelevant:

". . . Counsel . . . should [not] be permitted . . . to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the

trial of the case . . ." *Commonwealth v. McGrew,* *supra* 375 Pa. at 525–26, 100 A.2d at 470–71.

■ A trial court's refusal to permit certain hypothetical questions on voir dire will not be disturbed absent a palpable abuse of discretion. *Commonwealth v. Segers,* 460 Pa. 149, 156, 331 A.2d 462, 466 (1975); *Commonwealth v. McGrew, supra* 375 Pa. at 526–27, 100 A.2d at 471. We are satisfied that no abuse of discretion occurred in this case.

■ The question proposed by defense counsel was, it appears, designed to advise counsel in advance what a venireperson's personal reaction might be when, and if, the appellant elected not to take the stand in his own behalf. The inappropriateness of the question is further compounded by the fact that it was framed in terms of whether the venirepersons privately agreed with two fundamental concepts in the criminal law: the burden of the Commonwealth to prove guilt beyond a reasonable doubt and the right of an accused to remain silent. A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court. So long as the juror is able to, intends to, and eventually does, adhere to the instructions on the law as propounded by the trial court, he or she is capable of performing the juror's function. In this regard, it may safely be inferred that a juror will not violate his or her oath in the absence of any expression or other indications to the contrary.

"The law recognizes that it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings. We can only attempt to have them put aside those prejudices in the performance of their duty, the determination of guilt or innocence. We therefore do not expect a *tabula rosa* but merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision

solely on the facts presented, assiduously avoiding the influences of irrelevant factors." *Commonwealth v. Johnson*, 452 Pa. 130, 136, 305 A.2d 5, 8 (1973).

█ The trial court's instructions on both the failure of appellant to testify in his own defense and on the Commonwealth's burden of proof beyond a reasonable doubt of every material portion of the crime charged were accurate, definitive and comprehensive. In addition, prior to the selection of the jury, the court had informed the entire panel from which the jury was drawn that the defendant had no obligation to offer evidence nor to testify himself and that the burden to prove the conduct charged remained with the Commonwealth. After the jury was actually empanelled the court once again, in preliminary remarks, advised them of these constitutional mandates. There is not a scintilla of evidence in this record to suggest that any of the jurors harbored a reservation that would prevent the discharging of their duty in accordance with their oath. We therefore find that, under these circumstances, the failure to permit the requested question was not an abuse of discretion.

█ Appellant's next assignment of error is that the lower court wrongfully permitted into evidence certain rifle parts found in the appellant's closet at the time of his arrest. The foundation of this argument is the belief that the arrest was illegal because it was effectuated beyond the territorial jurisdiction of the arresting officer and that the evidence obtained in a search incidental to that arrest was thereby tainted by that illegality.

The facts surrounding the arrest in this case are as follows: Two days subsequent to the killing of William Ricky Green, Sergeant Lastowka, a Chester city policeman, went to the family home of appellant in the Borough of Parkside, Delaware County, and, pursuant to an arrest warrant issued by a Chester city magistrate, apprehended the appellant. The rifle parts in question were seized at that time.

The exact same factual and legal issue was presented to this Court in *Commonwealth v. Davis*, 466 Pa. 102, 351 A.2d 642 (1976). There a warrant for arrest for robbery was also issued in Chester, where the crime occurred, to the Chester city police officers. The accused was arrested in an apartment in the Borough of Marcus Hook. At the time of the arrest numerous items were found, including a weapon, which were subsequently introduced as evidence against him at trial.[2] In *Davis*, as here, it was claimed that the Act of 1963, August 6, P.L. 511, § 1, as amended, Act of 1973, November 2, No. 109, 19 P.S. 11 (Supp.1976–77) (hereinafter referred to as § 11) limited the power of Chester city police officers to make an arrest within the city limits unless they were in "hot pursuit" of a fleeing felon.[3] In advancing his argument, appellant ignored the provisions of the Act of 1860, March 3, P.L. 427, § 3, as amended; Act of 1899, May 2, P.L. 73, § 1, 19 P.S. § 3 (Supp.1976–77) (hereinafter referred to as § 3)[4] which provide:

2. As a result of the items found, Davis was linked to another robbery, apart from the one for which the warrant had been issued, where a death had resulted. The appeal was from the murder conviction.

3. At the time of appellant's arrest, Section 11 read as follows:
"Any police officer in the employ of a county, city borough, town or township may arrest, with or without a warrant, any felon beyond the territorial limits of the political subdivision employing such officer for a felony committed by the felon within the political subdivision employing the police officer if such officer continues in pursuit of the felon after commission of the felony."
The subsequent amendment included misdemeanors and summary offenses as grounds for warrantless arrests outside the jurisdictional limits if done in pursuit of the offender. *United States v. Getz*, 381 F.Supp. 43 (E.D. of Pa.1974), affirm 3 Cir., 510 F.2d 971, cert. den., 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1976); *Commonwealth v. Robb*, 238 Pa.Super. 62, n. 1 at 66, 352 A.2d 515, n. 1 at 517 (1975).

4. This section was suspended by Rule 159(d) of the Pennsylvania Rules of Criminal Procedure, eff. January 1, 1974, insofar as it is inconsistent with Rules 61 and 123 of the same Rules. The change brought about by the Rule concerned the procedures to be followed in these instances but did not alter the substantive powers conferred under Section 3. *Cf. Commonwealth v. Levesque*, 469 Pa. 118, 364 A.2d 932 (1976).

In case any person against whom a warrant may be issued by any judge or alderman of any city, or justice of the peace of any county in this commonwealth, for any offense there committed, shall escape, go into, reside, or be in any other city or county out of the jurisdiction of the judge, alderman, or justice of the city or county granting such warrant as aforesaid, *it shall and may be lawful for the person to whom such warrant was originally directed,* or the person having such warrant for execution, *to execute the same, and arrest such offender in such city or county, out of the jurisdiction of the alderman,* justice or justices granting such warrant aforesaid, and to carry the defendant before any alderman, justice or justices in the city or county in which such offender may be apprehended; (Emphasis added).

In *Davis* we held that Section 3 not only extended the legal efficacy of the warrant beyond the jurisdictional limit of the issuing authority but it also empowered the officer charged with the duty to execute the process to cross the boundary of the political subdivision which employed him to make the arrest even in absence of the element of pursuit. *See Commonwealth v. Davis, supra.*[5] Having rejected appellant's claim of the illegality of the arrest, his claim for the suppression of the tangible evidence premised upon this supposed illegality must also fail.[6]

5. While this writer only concurred in the result in *Commonwealth v. Davis,* 466 Pa. 102, 351 A.2d 642 (1976), I was in complete accord with this portion of the opinion.

6. A second provision which appellant cites as controlling this arrest is as follows:

Policemen shall be ex-officio constables of the city, and shall and may, within the city or upon property owned or controlled by the city or by a municipality authority of the city within the Commonwealth, without warrant and upon view, arrest and commit for hearing any and all persons guilty of breach of the peace, vagrancy, riotous or disorderly conduct or drunkenness, or who may be engaged in the commission of any unlawful act tending to imperil the personal security or endanger the prop-

The third assignment of error relates to the trial court's refusal to allow certain post-arrest extra-judicial statements allegedly made by the appellant to be introduced before the jury by the defense in support of its insanity claim. The factual setting in which this claim arises is significant. Approximately four months after his arrest for this crime, appellant was ordered committed to Farview State Hospital upon a finding that appellant was incompetent to stand trial at that point in time. He remained in that institution from his commitment on May 13, 1971, until September 27, 1972 (18 months after his arrest) when it was ascertained that he was competent to participate in a trial. At trial appellant's sole defense was his asserted insanity at the time of the commission of the offense. The statements which form the basis for this objection were supposedly made during his confinement in Farview.

Specially, the trial court would not permit appellant's father to testify as to statements made to him by his son concerning the son's preoccupation with the belief that his fellow inmates at Farview intended to kill him. Dr. Ivins, a psychiatrist, was not permitted to testify as to the contents of two letters sent to him by appellant while he was incarcerated at Farview. The court also prevented a psychologist, who treated appellant at Farview, from relating conversations with appellant during this period. The appellant places particular emphasis on the exclusion of those conversations with the psychologist that revealed appellant's belief that the victim was controlling appellant's life through the sale of drugs to ap-

---

erty of the citizens, or violating any of the ordinances of said city for the violation of which a fine or penalty is imposed.

Act of June 23, 1931, P.L. 932, art. XX, § 2005, as amended, Act of 1951, June 28, P.L. 662, § 20, 53 P.S. § 37005 (Supp.1976–77). This provision, however, specifically concerns itself solely with arrests for certain misdemeanors made within the territorial limits of the officer's jurisdiction and without a warrant. We do not believe that it is applicable to the instant appeal, nor does it "exclude alternative authorizations for arrest." *Commonwealth v. Davis, supra* 466 Pa. at 107, n. 2, 351 A.2d at 645, n. 2.

pellant's wife. The trial court excluded this testimony on the grounds of remoteness.

■ It has long been the law in this Commonwealth that an accused's statements to third persons may be offered to indicate the mental state of the accused where his sanity is in issue.

Evidence bearing on defendant's state of mind before, at, and after the commission of the crime, and showing a basis for insanity, is properly admissible on a plea of insanity. While such evidence usually consists of acts, yet statements to others indicating an unsound mind *may* be received. The hearsay rule forms no objection to the statements to third parties since they are received without reference to the truth of the statement, being merely indicative of a state of mind. *Commonwealth v. Williams,* 307 Pa. 134, 144, 160 A. 602, 605 (1932). (Emphasis added)

*See also, Commonwealth v. Wright,* 455 Pa. 480, 486, 317 A.2d 271, 274 (1974); *Ryman's Case,* 139 Pa.Super. 212, 221, 11 A.2d 677, 681 (1940); McCormick, *Evidence,* § 249, pp. 590–91 (2d ed. 1972); 6 Wigmore, *Evidence,* § 1714, pp. 90–91 (Chadbourn rev. 1976).

In this context the accused's comments may be evaluated in the same manner as his nonverbal behavior as being reflective of the condition of his mind. Recognizing that one's verbal conduct may be just as illuminating upon the state of mind of the declarant as his nonverbal conduct, text writers have recognized the wisdom of excluding irrational expressions which are offered to show mental incompetence, regardless of their form, from the constraints of the hearsay rule. McCormick, *Evidence,* § 249, pp. 592–93 (2d ed. 1972).

"One of the main sources of proof of mental competency or incompetency is the conduct of the person in question, showing his normal or abnormal response to the circumstances of his environment. By this test, every act of the subject's life, *within reasonable limits of*

*time,* would be relevant to the inquiry. As to nonverbal conduct no problem of hearsay is involved . . .. While it may be argued that, since abnormal conduct can be simulated, the significance of such acts may in some degree be dependent upon the want of deceptive intent, no doubt exists as to the admissibility of the evidence, *subject to the practical limitations of relevancy.* The same approach is adopted in receiving evidence of verbal conduct, . . .. These expressions are treated as evidence of irrational conduct, rather than as hearsay statements of belief offered to show that the declarant does entertain the belief which he asserts." *Id.* at 593. (Emphasis added).

However, as the above quotation suggests there is a period, whether the act is verbal or nonverbal, when the conduct may become so removed in time from the critical period that its probative value is de minimis, if not absent, at least to the mind of a layperson.

"A statement made out of court by a person may be repeated by a witness in court, as a verbal act not subject to the hearsay rule, if the purpose of such evidence is to show declarant's state of mind, as in the case of a threat, or to show his intent, or his sanity. It matters not whether such a statement is oral or written, or whether it was made prior to or after the crime charged, *provided that it is not so remote as to lose its probative value."* Wharton, *Criminal Evidence,* Vol. II, § 274, 26–28 (13th ed. 1976) (Emphasis added).

In evaluating the court's exercise of its discretion in excluding this evidence on the basis of remoteness it is important to note that the entire defense was based on appellant's asserted insanity at the time of the act. However, the record demonstrates that the defense was permitted extensive testimony concerning appellant's mental condition from numerous witnesses, including the appellant's wife, father, brother, mother, friends, a medi-

cal doctor, a psychiatrist and a psychologist. The trial court did permit statements to others made by appellant before the date of the commission of the crime. Further statements made to third parties after the crime which the trial court deemed to be "shortly after" or "reasonably close in time" were also permitted. Even as to the statements that were excluded, the court nevertheless permitted their use by the psychiatrist and psychologist as part of the data upon which these experts relied to form their respective opinions as to appellant's sanity. Also, the court permitted appellant's lay witnesses to express their opinions concerning his sanity without attempting to restrict the period of observation during which these opinions were formed. Lastly, it is to be noted that it is not suggested that the excluded utterances reflected a behavior trait different in character or quality from that already displayed before the jury by other evidence which was admitted, but only that these statements would cumulatively bolster the testimony that had been presented. Under all of these circumstances including the fact that the excluded testimony related to statements, that were made as long as 18 months after the crime, and the fact that extensive testimony on appellant's state of mind prior to, and for a reasonable period after, the event, was introduced we cannot hold that the trial court's ruling constituted an abuse of discretion.[7]

The next complaint is that the trial court made several allegedly prejudicial remarks to defense counsel thereby depriving appellant of a fair and impartial trial.[8]

7. Appellant points to the fact that the experts were allowed to use the excluded statements in forming their opinions as indicative of the arbitrariness of the ruling. To the contrary, we believe that it was quite reasonable for the court to conclude that by virtue of their expertise they would be better equipped to equate the significance of the time lapse between the act and the utterance.

8. The comments complained of were as follows: 1) "We don't need any speeches Mr. Evans. . . . I have permitted you great latitude now. I think we have gone far enough" (following

■ It is a maxim of our jurisprudence that a trial judge occupies an exalted and dignified position and that absolute impartiality in the conduct of the trial is expected of him.

> "The judge occupies an exalted and dignified position; he is the one person to whom the jury, . . . looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box . . ." *Commonwealth v. Myma,* 278 Pa. 505, 508, 123 A. 486, 487 (1924).

In *Commonwealth v. Stallone,* 281 Pa. 41, 43–44, 126 A. 56, 57 (1924), commenting on the obvious ill-feeling which emanated at trial in that case between defense counsel and the court, we stated:

> Whether court or counsel was responsible for the unfortunate situation cannot be determined from the printed record. Regardless of who was at fault, any display of partiality or prejudice on the part of the trial judge for or against a party or his attorney must necessarily tend to influence the jury. The trial judge is the person to whom the jurors look for guidance and in whom they expect and have a right to find an impartial attitude.

Despite these exacting requirements of equanimity we have often held that:

> Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it*

the sustaining of several objections to the defense's use of leading questions) 2) "We are trying the events of January 24, 1971, not the entire prison system, Mr. Evans." (following the sustaining of a Commonwealth objection to a question posed to the appellant's father as to what appellant told him about how he felt and how he was being treated in prison), 3) "That clock won't help you back there, Mr. Evans. It is about 3:12 now." (following the glance at a clock in the courtroom by defense counsel).

*is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.* (Citations omitted) *Comm. v. Goosby,* 450 Pa. 609, 611, 301 A.2d 673, 674 (1973), quoting from *Comm. v. Phillips,* 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957). *See also, Commonwealth v. Palmer,* 463 Pa. 26, 35–36, 342 A.2d 387, 392 (1975). (Emphasis in original).

While we do not condone a display of impatience by a trial judge, even where he may have been provoked by counsel's dilatory tactics, we recognize that judges are also subject to the failings of human beings and cannot be expected to be devoid of emotion in the trying or vexing situations they may be called upon to confront. Here, after a careful review of the record before us, we are satisfied that these isolated comments, which were directed solely to counsel and not his client, did not reach the level where it could be reasonably concluded that appellant was deprived of a fair and impartial trial. Appellant complains of no extended, aggressive or partisan examination of himself, *Commonwealth v. Williams,* 468 Pa. 453, 364 A.2d 281 (1976); *Commonwealth v. McCoy,* 401 Pa. 100, 162 A.2d 636 (1960), no indication of the opinion of the court on the merits of the case, *Commonwealth v. Motley,* 448 Pa. 110, 289 A.2d 724 (1972) ; no expressions of doubt as to the credibility of a witness, *Commonwealth v. Butler,* 448 Pa. 128, 291 A.2d 89 (1972); and no independent manifestation of bias in favor of the prosecution, *Commonwealth v. Hales,* 384 Pa. 153, 119 A.2d 520 (1956) ; *Commonwealth v. Trunk,* 311 Pa. 555, 167 A. 333 (1933). Additionally, the court in its instructions properly charged that the jury was the sole judge of the facts and the arbiter of the truth. Under these circumstances we cannot say that the remarks of the court so tainted the proceeding as to require a reversal of the judgment of sentence. *See Commonwealth v. Myma, supra.*

Lastly, appellant charges that the trial court was obliged to instruct the jury on the elements of voluntary manslaughter as a possible verdict since some evidence was introduced which would have warranted such a verdict.[9] Conceding, without deciding the merits of the contention, that the psychiatric evidence introduced may have supported a finding that because of his delusional state appellant's conduct was inspired by passion rather than malice, it is, nevertheless, clear that there is no evidence which would support a determination that sufficient legal provocation, an essential ingredient of the crime of voluntary manslaughter, was present. *Commonwealth v. Long*, 460 Pa. 461, 333 A.2d 865 (1975); *Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972); *Commonwealth v. Brown*, 436 Pa. 423, 260 A.2d 742 (1970); *Commonwealth v. Barnosky*, 436 Pa. 59, 258 A.2d 512 (1969). In this regard the testimony established that appellant entered a coffee shop, quietly chatted for a few minutes with the decedent and another individual and then ordered the two to lie on the floor and proceeded to shoot the victim. The record is devoid of any provoking circumstance or event which could explain the drastic change in the character of the meeting from an apparent convivial conversation to an aggressive assault. Absent such evidence providing a reasonable basis upon which a finding of adequate legal provocation could be premised, the trial court was undoubtedly correct in refusing the requested charge under our former law.[10]

9. In this case, appellant has not attempted to argue in the alternative that he was entitled to a voluntary manslaughter charge in the absence of evidence of passion and provocation. *Compare, Commonwealth v. Myles*, 471 Pa. 616, 370 A.2d 1193 (filed March, 1977); *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (filed February, 1977); *Commonwealth v. Cain*, 471 Pa. 140, 369 A.2d 1234 (1977).

10. At tne time of appellant's trial a defendant was only entitled to have a jury charged with respect to voluntary manslaughter if requested and if some evidence was adduced at trial which would support such a finding. *Commonwealth v. Cannon*, 453 Pa. 389, 309 A.2d 384 (1973); *Commonwealth v. LaRue*, 381 Pa. 113, 112 A.2d 362 (1955). *Compare, Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974).

*Commonwealth v. Cannon,* 453 Pa. 389, 309 A.2d 384 (1973); *Commonwealth v. Davis,* 449 Pa. 468, 297 A.2d 817 (1972); cert. denied, 414 U.S. 836, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973); *Commonwealth v. Dews,* 429 Pa. 555, 558, 239 A.2d 382, 384 (1968); *Commonwealth v. LaRue,* 381 Pa. 113, 112 A.2d 362 (1955); *Commonwealth v. Flax,* 331 Pa. 145, 200 A. 632 (1938); *Commonwealth v. Pava,* 268 Pa. 520, 112 A. 103 (1920); *Commonwealth v. LeGrange,* 227 Pa. 368, 76 A. 63 (1910); *Commonwealth v. Sutton,* 205 Pa. 605, 55 A. 781 (1903); *Clark v. Commonwealth,* 123 Pa. 555, 16 A. 795 (1889).

 In the alternative appellant urges that evidence was introduced at trial to the effect that he was an habitual drug user and that he had actually been imbibing alcoholic beverages on the evening of the crime. He contends that this testimony justified a charge on voluntary manslaughter under the theory that his intoxication *reduced* the crime to voluntary manslaughter. This position is clearly meritless. It is black letter law in this Commonwealth that voluntary intoxication neither exonerates nor excuses criminal conduct. *Commonwealth v. Brabham,* 433 Pa. 491, 252 A.2d 378 (1969); *Commonwealth v. Reid,* 432 Pa. 319, 247 A.2d 783 (1968); *Commonwealth v. Simmons,* 361 Pa. 391, 65 A.2d 353 (1949), cert. denied, 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528, reh. denied, 338 U.S. 888, 70 S.Ct. 181, 94 L.Ed. 546 (1950). The only legal significance of the voluntary consumption of alcoholic beverages or drugs is when the result thereof is to diminish the accused's mental capacity to the extent that it renders him incapable of forming the specific intent required by the crime. *Commonwealth v. Grello,* 464 Pa. 250, 346 A.2d 543 (1975); *Commonwealth v. Haywood,* 464 Pa. 226, 346 A.2d 298 (1975); *Commonwealth v. Graves,* 461 Pa. 118, 334 A.2d 661 (1975). Where the question of intoxication is introduced into a murder case its only effect could be to negate the specific

intent to kill which is required for a finding of murder of the first degree. *Commonwealth v. Ingram,* 440 Pa. 239, 270 A.2d 190 (1970). If intoxication does render an accused incapable of forming the necessary intent the result is to reduce the crime to a lesser degree of murder. In no event does the reduction change the character of the crime from murder to manslaughter. *Commonwealth v. Brown, supra,* 436 Pa. at 427, n.4, 260 A.2d at 744, n.4 (1970); *Commonwealth v. Walters,* 431 Pa. 74, 83, 244 A.2d 757, 762 (1968). As a result, a charge on voluntary manslaughter was not required.

Accordingly, the judgment of sentence is affirmed.

JONES, former C. J., did not participate in the decision of this case.

ROBERTS and MANDERINO, JJ., filed dissenting opinions.

ROBERTS, Justice, dissenting.

Appellant, whose entire defense was that he was insane at the time of the crime, was not permitted to introduce into evidence a statement which tended to prove his insanity. This statement, made to a psychologist who was treating appellant, revealed appellant's belief that his wife and friends had been under the control of the victim. The majority holds that the trial court did not err in excluding this evidence as too remote. I cannot agree.[1]

Statements made by the accused may reveal his mental condition. J. McCormick, Evidence § 249, at 593 (2d ed. 1972). Statements made by the accused before or after

---

1. Several other statements made by the appellant were also excluded as too remote. These included statements concerning appellant's preoccupation that others were trying to kill him, and two letters sent by appellant to a psychiatrist. Because I believe it was reversible error to exclude appellant's statement that the victim was controlling his wife and friends, it is unnecessary to decide whether the exclusion of any of these statements also requires that a new trial be granted.

the crime are relevant to the issue of insanity at the time of the crime. *Id.* at 592–93, 2 J. Wigmore, Evidence § 233 (3d ed. 1940). Professor Wigmore reasons:

"A condition of mental disease is always a more or less continuous one, either in latent tendency or in manifest operation. It is therefore proper, in order to ascertain the fact of its existence at a certain time, to consider its existence at a prior or subsequent time."

2 J. Wigmore, Evidence § 233, at 25 (3d ed. 1940).

The trial court may exclude such evidence if it is too remote to the issue whether the accused was insane at the time of the crime. 2 J. Wigmore, Evidence § 233 (3d ed. 1940). In the exercise of this discretion, however, the court must be guided by the principle that broad latitude must be given to allow presentation of evidence which may have a bearing on the sanity of the accused. As Judge (now Mr. Justice) Blackmun stated in *Pope v. United States,* 372 F.2d 710, 736 (8th Cir. 1967): "[W]e expect a trial judge, in a case involving criminal responsibility, to be free in his admission of all possibly relevant evidence . . . ." Accord, *United States v. Hartfield,* 513 F.2d 254 (9th Cir. 1975); *United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969 (1972). This principle must be carefully observed when the evidence is offered by the accused, as the accused must not be deprived of the right to present relevant evidence. See generally *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Commonwealth v. Boyle,* 470 Pa. 343, 368 A.2d 661 (1977).

While being treated for his mental condition, appellant told his psychologist that he believed the victim was controlling his wife and friends. From this statement, a clear inference arises that this was appellant's belief at the time of the crime. I believe that the trial court erred in excluding this statement, made eighteen months after the killing, as too remote. Cf. *Robinson v. United States,* 144 F.2d 392 (6th Cir. 1944), aff'd, 324 U.S. 282,

65 S.Ct. 666, 89 L.Ed. 944 (1945) (letter written by the accused nearly two years after crime was properly admitted when sanity was at issue.) Remoteness is not simply a question of how long after the crime the statement was made. Rather, remoteness involves a determination whether various factors make the probative value of the evidence to the issue of the accused's insanity at the time of the crime unduly speculative. Not only the lapse of time between the crime and the statement must be considered, but also the nature of the evidence offered and the possible effect of intervening events. Here, the excluded statement dealt with appellant's beliefs concerning the circumstances existing at the time of the crime, and his reasons for committing the crime. This evidence bears a close relation to appellant's state of mind when he killed the victim, and there is little reason to fear that appellant's beliefs reflect events which occurred after the killing, rather than his state of mind at the time of the killing.[2] It was an abuse of discretion for the court to keep this evidence from the jury.

Moreover, appellant's statement was offered as part of the testimony of his psychologist. The psychologist's ability to explain the relevance of the statement to the issue of appellant's insanity at the time of the crime removes any danger that the relation between the evidence offered and the issue of insanity was too remote or speculative.

It was particularly important to appellant that this evidence be admitted at trial, as appellant exercised his privilege against self-incrimination and thus did not testi-

2. Indeed, if appellant had explicitly stated that this was his belief at the time of the crime, there would be no remoteness problem at all. Instead, the question would be whether this statement, dealing with appellant's past state of mind, was admissible under an exception to the hearsay rule. See generally Meany v. United States, 112 F.2d 538 (2d Cir. 1941) (per Hand, J.) (hearsay exception for statements made to treating physician includes statements relating to past condition); Fed.R.Evid. 803(4); J. McCormick, Evidence § 292 (2d ed. 1972).

fy at trial as to his state of mind at the time of the killing. Because of the close relation appellant's belief that the victim was controlling his wife bears on his state of mind when he killed the victim, the admission of other evidence of insanity does not render this evidence cumulative.

Nor can I conclude that, because the psychologist who relied on appellant's statement was allowed to testify as to appellant's sanity, it was harmless error to exclude this statement. That we allow the jury to reject the conclusions of this expert makes plain the need to have him explain the basis of his opinion:

> "The chief value of an expert's testimony in this field . . . rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion."

*Carter v. United States,* 102 U.S.App.D.C. 227, 252 F.2d 608, 617 (1957); see *United States v. Smith,* 507 F.2d 710 (4th Cir. 1974). Precisely because appellant's statement formed the basis for the opinion of this expert, it was important that this statement be admitted into evidence. Unless the psychologist was allowed to testify about this evidence, and explain why it indicated that appellant was insane, appellant had little hope of persuading the jury to adopt the conclusions of this expert.

For these reasons, I cannot agree with the majority that the trial court did not abuse its discretion in excluding evidence relevant to the issue of insanity, appellant's only defense. I dissent and would grant appellant a new trial.

MANDERINO, Justice, dissenting.

Because the majority erroneously decides two of the issues presented by appellant in this appeal—each of which entitles him to a new trial—I dissent.

24

Initially, the majority concludes that the trial court committed no abuse of discretion when it refused to allow questioning of prospective jurors as to their views of a criminal defendant's constitutional right not to testify in his own behalf and of the prosecution's burden to prove guilt beyond a reasonable doubt. I disagree. As the majority correctly notes, we seek jurors whose minds are ". . . sufficiently conscious of [their] sworn responsibilit[ies] and [who are] willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influences of irrelevant factors." (At p. 1296 quoting from *Commonwealth v. Johnson*, 452 Pa. 130, 136, 305 A.2d 5, 8 (1973)). The majority, acknowledging that it would be impermissible to seat a juror who believed that the accused should be required to testify on his own defense, then states, "[t]here is not a scintilla of evidence in this record to suggest that any of the jurors harbored a reservation [as to the defendant's right to remain silent] that would prevent the discharging of their duty in accordance with their oath." Of course there is no evidence! The trial court refused to allow defense counsel to ask any questions which might have uncovered the existence of any such "reservations." That refusal was an abuse of discretion, and on that basis appellant should be given a new trial.

The voir dire examination should be conducted in a manner calculated ". . . to discover the state of mind of the juror with respect to the matter at hand or any collateral matter reasonably liable to unduly influence him . . ." 47 Am.Jur.2d, Jury, § 201. See generally, 47 Am.Jur.2d, Jury, §§ 195, 200, 201.

For these reasons, the courts have held that racial, religious, economic, social, or political prejudice of prospective jurors are proper subjects of inquiry on voir dire examination in criminal cases. See generally, Annotation, 54 A.L.R.2d 1204, and cases cited therein. Likewise, beliefs regarding the death penalty are proper subjects of

inquiry in capital cases. See Annotation, 48 A.L.R.2d 560, and cases cited therein.

The allocation of the burden of proof in criminal cases and the right of an accused to remain silent in the face of criminal charges are two of the most misunderstood concepts in the criminal law. Being untrained in the law, jurors not only have difficulty comprehending these principles, but often come to the jury selection process saddled with misconceptions as to what these concepts mean. See e. g., *Commonwealth v. Rolison*, 473 Pa. 261, 374 A.2d 509, (filed June 3, 1977) (dissenting opinion of Manderino, J.). The record in *Rolison* revealed that a substantial percentage of the prospective jurors questioned as to their understanding of these fundamental concepts were unable to lay aside their misconceptions about them and accept the instructions of the trial judge as to their proper application to the case. Certainly, those whose beliefs are at odds with these principles would properly be challenged for cause, and the refusal to grant such a challenge would be an abuse of discretion and reversible error. But a challenge for cause cannot be made if there is no opportunity to discover the prospective juror's fixed misconception. Furthermore, allowing questions such as those requested here would give defense counsel the opportunity to obtain the information necessary for an intelligent exercise of the right of peremptory challenge. The numerous peremptory challenges that a criminal defendant is allowed are of little practical value if counsel is unable to obtain sufficient knowledge about the prospective jurors to enable an intelligent exercise of those challenges. *See,* ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, Approved Draft, 1968, § 2.4:

> "A voir dire examination should be conducted for the purpose of discovering bases for challenge for cause *and* for the purpose of gaining knowledge to enable intelligent exercise of peremptory challenges." (emphasis added).

26

Secondly, I would reverse appellant's judgment of sentence and grant a new trial because the trial court should have granted appellant's request that the jury be instructed on the elements of the crime of voluntary manslaughter. See *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977) (opinion by Roberts, J.) and *Commonwealth v. Cain*, 471 Pa. 140, 369 A.2d 1234 (1977) (opinion in support of reversal by Roberts, J. and opinion in support of reversal by Manderino, J.).