364 A.2d 281
**COMMONWEALTH of Pennsylvania**
v.
**Lynn WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1975.

Decided Oct. 8, 1976.

454

Judgment of sentence reversed and new trial ordered.

Irving L. Madnick, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

This is an appeal from the judgment of sentence of life imprisonment imposed on appellant, Lynn Williams, following his conviction by a jury of murder in the first degree and the denial of his post-verdict motions.[1] For the reasons which follow, we reverse the judgment of sentence and remand for a new trial.

A review of the evidence will place in perspective the legal issue which compels a new trial.[2] On the evening of Sunday, May 23, 1971, appellant, accompanied by his girl friend, Debra Weintraub, was driving in his automobile in the Wynnefield section of the City of Philadelphia, looking for his cousin, Herbert Cain. In the course of his search he encountered Herbert's brother, Gerald Cain and several other persons. From Gerald Cain, Williams learned that someone wanted to purchase marijuana and methedrine, commonly known as "speed", for the sum of $500. Williams was carrying a .38 caliber snubnose pistol and "dumdum" bullets which, soon after the encounter with Cain, he exhibited to the group.

Cain and two of his companions then joined Williams and Miss Weintraub and together they drove to the Marriott Motor Hotel in Bala Cynwyd, where the individual who wanted to buy the drugs reportedly was staying. En route to the hotel appellant expressed his intention to hold up "somebody" at the hotel. He then gave his gun

---

1. Appellant was convicted at the same trial of aggravated robbery and burglary. Sentences of ten to twenty years imprisonment were imposed on each of these offenses, the sentences to run concurrently with the life sentence. Appeals from those judgments are not before us presently.

2. A review of the evidence is, in any event, required by the Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 in all cases of murder in the first degree. The evidence will be viewed in the light most favorable to the Commonwealth as the verdict winner. *Commonwealth v. Green*, 464 Pa. 557, 347 A.2d 682 (1975).

to Gerald Cain and told him that he was to use it in the holdup; Miss Weintraub, according to the plan formulated by the appellant, was to go into the hotel and pretend to be Gerald Cain's girl friend. She became frightened, however, and asked to be taken home. Williams told her not to worry because there wouldn't be any shooting. One of the others in the car, however, explained, "If we have to, we'll kill them."

Arriving at the Marriott, Cain, Debra Weintraub and the other two men went into the hotel, the appellant remaining in his car in the parking lot. Miss Weintraub slipped away from the others and ran outside. Seeing a police cruiser, she ran up to it and told the officer of the holdup plan, stating that "there was going to be some shooting done." The officer apparently discounted her story and sent her home in a taxicab.

Approximately fifteen minutes after he had gone inside the hotel, Cain returned to Williams' car with one Glenn Edwards, identified by Cain as the person who wished to buy the drugs. When Williams saw that Miss Weintraub was not with Cain, he went inside the hotel to look for her. He there telephoned his apartment and talked with one David Hunt. Williams asked Hunt if he knew where he (Williams) could purchase some marijuana or methedrine. When Hunt answered in the negative, Williams asked him if he wanted to rob the guy he was with who, Williams said, had $500. Hunt replied that "stickups weren't my thing," but that two other men then in the apartment, Daniel ("Little Dan") Clark and Calvin ("Pepper") Williams, had overheard the conversation and were interested in the robbery plan. These two suggested a "shooting gallery" [3] on Irving Street as a place to stage the hold-up. Williams then spoke to Pepper and Little Dan directly. He told them that he would meet them at the "shooting gallery" and would

3. Hunt testified at trial that a "shooting gallery" is a place where drug addicts go when they want to use drugs.

slip his gun to one of them. He also told them that he wanted it to appear that he was the target of the robbery.

Appellant returned to his car and drove, with Gerald Cain and Glenn Edwards, to the Irving Street address. There they were greeted by Little Dan and Pepper, and the latter led everyone to the back of the darkened house. When they reached a backroom, appellant gave his gun to Pepper. Pepper grabbed Edwards by the arm, threw him up against the wall and commanded him to "get it up." He repeated the order a second time, then shot Edwards in the head and proceeded to rob him of his money. While this was going on, Little Dan fled, followed shortly by the others. Williams and Cain ran to Williams' car and drove away. They came upon Pepper at the corner of 52d and Locust Streets, and appellant asked him what he had done with the gun. Pepper replied that he had thrown it away in a vacant lot. At Williams' direction Pepper then retrieved the gun and returned it to the appellant, who placed it in the glove compartment of his car.

Williams, Pepper, and Cain drove to appellant's apartment, where David Hunt and Little Dan had preceded them. Pepper took the Edwards money from his pocket and, after counting it, announced that he was taking $115, was giving $45 to Little Dan, and that Williams and Cain should divide the remaining $70. Cain and the appellant took their shares, left the apartment and drove to Cain's apartment in Bryn Mawr where appellant stayed the night. The next morning he drove to his mother's house in Philadelphia where he hid the gun in a metal box in his sister's bedroom. Two days later he was arrested outside of his apartment building on Walnut Street, having been pointed out to the police by Gerald Cain.

It is manifest from the foregoing summary that the evidence adduced at trial was more than sufficient to

permit the jury to find the appellant guilty of murder in the first degree beyond a reasonable doubt. *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976); *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975).

We now turn to consideration of one of appellant's allegations of error. At trial, Williams took the stand in his own defense. It is his contention that the trial judge committed reversible error by cross-examining him in such a manner as to convey to the jury the impression that the judge did not believe appellant's testimony, and thereby effectively removed from the jury's consideration the question of appellant's credibility.

In the Commonwealth's case in chief, the Commonwealth introduced into evidence certain unsigned statements purportedly made by Williams to the police during interrogation immediately following his arrest.[4] The statements contained oral admissions of complicity in the robbery-shooting of Glenn Edwards made by the appellant and reduced to writing by the police. On the witness stand, Williams steadfastly maintained that he had never been advised of his *Miranda*[5] rights prior to his questioning by the police and that his requests to consult with an attorney during his interrogation had been denied. He testified, however, that he was given the opportunity to telephone to his sister. The purpose of this call, he stated, was to inform her that the police were going to come to their mother's house, where the sister

4. Prior to trial, Williams had moved to suppress the statements allegedly given by him to the police on the ground, *inter alia,* that he had not been advised of his constitutional rights before making those statements. At the suppression hearing, the interrogating officers testified that appellant had been warned several times of his *Miranda* rights during the interrogation process. The suppression court chose to believe the officers, and held the statements admissible. At trial the defendant renewed the charge that he had not been told his rights. *See* Pa.R.Crim.P. 323(j); see also *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975).

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lived, in order to pick up the gun used in the murder. The following colloquy relative to this telephone call then ensued between the trial judge and appellant:

"THE COURT: Yes. I didn't get this. Did you say that no one ever advised you of your Constitutional rights at any time?

THE WITNESS: That is correct, sir.

THE COURT: You heard either Detective Ross or Lieutenant Patterson say that when they called your sister and you got on the phone, did they call your sister for you?

THE WITNESS: Yes, they did, sir.

THE COURT: And you got on the phone. You spoke to your sister, didn't you?

THE WITNESS: Yes, I did.

THE COURT: You knew it was your sister, didn't you?

THE WITNESS: That is correct.

THE COURT: Did you ever complain to your sister?

THE WITNESS: They told me what to say, Your Honor. He was standing right there.

THE COURT: He told you what to say?

THE WITNESS: The telephone call was to inform my sister that they was coming out to get the pistol, and that was the extent of that.

THE COURT: *And you had no chance to shout into the phone, get me a lawyer, I don't want to talk?*

THE WITNESS: I said to my sister what they requested me to say, Your Honor.

THE COURT: But you didn't take upon yourself to say to your sister—*incidentally, did they have a gun against your back?*

THE WITNESS: No, sir.

MR. MADNICK: If Your Honor please, I would object to that, Your Honor.

THE COURT: No further questions by the Court." (emphasis added)

Appellant complains that the tenor of the judge's questions, particularly the final question, "did they have a gun against your back," was so prejudicial as to have deprived him of a fair trial. We must agree.

In *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973), we reiterated the general rule relative to statements made by the trial judge during the trial:

" 'Every unwise or irrelevant remark made in the course of a trial by a judge . . . does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.' " Id.* at 611, 301 A.2d at 674 (emphasis in *Goosby* ).

We believe that the trial judge's reference to a gun at the defendant's back, when viewed in context of appellant's defense at trial, was such a remark. Cf. *Commonwealth v. Coleman*, 235 Pa.Super. 379, 341 A.2d 528 (1975). Our reasons for this conclusion follow.

As noted above, appellant denied that he had been accorded his constitutional warnings prior to being questioned by the police. It is also important to note that he denied the accuracy of crucial inculpatory portions of the resulting statements. While admitting that large portions of the confessions were true, Williams contended on the stand that they also contained statements attributed to him which he had not made. Two of these variances are of particular significance: First, Williams denied stating that he knew that the victim, Glenn Edwards, was to be robbed; on the stand he maintained that he be-

lieved that the sole purpose of the meeting in the Irving Street "shooting gallery" was to purchase drugs. Second, he denied having stated that he had *given* the gun to Pepper Williams immediately prior to the shooting; rather he testified that Pepper *snatched* the gun from Williams' belt.

In light of these denials and variances, it is apparent that one of the crucial issues facing the jury was the weight, if any, it should give to the confessions. If, as he claimed, appellant had not been advised of his *Miranda* rights, the statements should be disregarded altogether. If, on the other hand, the jury were to conclude that Williams had been given the constitutional warnings, it would be entitled to consider the statements. Williams' entire defense rested upon his claim that he was, as he asked the trial judge to charge, merely a "terrified onlooker" at the robbery-murder of Glenn Edwards. The confessions, however, painted an entirely different picture as to appellant's knowledge of the criminal purpose for the meeting with Edwards and appellant's active participation in the robbery-murder.

■ Appellant's denials of complicity at trial were not completely lacking in verisimilitude since no signed waiver of rights form was introduced into evidence and the statements themselves were unsigned.[6] Much, therefore, depended upon the jury's assessment of the credibility of the defendant. The judge's reference to a gun at the defendant's back indicated quite clearly to the jury the judge's own disbelief of appellant's allegations that he had not been advised of his constitutional rights and that he had been denied his right to speak with a lawyer. A question so partisan in nature, although perhaps excusable if made by opposing counsel on cross-

6. There was testimony that appellant had signed a form of consent to a polygraph examination but the officer who obtained the consent testified that the form did not list the constitutional warnings.

examination,[7] has no place in a judge's conduct of a trial, particularly a trial for murder. What we said in a similar context in *Commonwealth v. McCoy*, 401 Pa. 100, 104, 162 A.2d 636, 638 (1960) is equally applicable here: "We can well appreciate the high sense of moral indignation the presiding jurist experienced in listening to the account of the heinous crime involved. Yet, under such circumstances, it is more imperative than ever that one charged with such a great responsibility should preside with calmness and equanimity to make sure that the right of the defendant to a fair and impartial trial is constantly kept inviolate."

In the case of *Commonwealth v. Butler*, 448 Pa. 128, 291 A.2d 89 (1972), we said:

"Credibility is solely for the jury. Just as a trial judge is not permitted to indicate to the jury his views on the verdict that they should reach in a criminal case, *Commonwealth v. Motley*, 448 Pa. 110, 289 A.2d 724 (1972), *Commonwealth v. Archambault*, 448 Pa. 90, 290 A.2d 72 (1972), similarly he is not permitted to indicate to a jury his views on whether particular witnesses are telling the truth." *Id.* at 134–35, 291 A.2d at 92.

Mr. Justice (later Chief Justice) Kephart, speaking for the Court in *Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924), sharply delineated the reasons for requiring the trial judge to act with circumspection in this area:

"*Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires.* It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is in-

7. But see *Commonwealth v. Russell*, 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971); *Commonwealth v. Pfaff*, 233 Pa.Super. 153, 335 A.2d 751 (1975).

definite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination. *The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table. To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence. Judges should refrain* from extended examination of witnesses; they should *not, during the trial, indicate* an opinion on the merits, *a doubt as to the witnesses' credibility,* or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them." (emphasis added)

See *Commonwealth v. McCoy,* 401 Pa. 100, 162 A.2d 636 (1960); *Commonwealth v. Hales,* 384 Pa. 153, 119 A.2d 520 (1956); *Commonwealth v. Trunk,* 311 Pa. 555, 167 A. 333 (1933). *See also* ABA Canons of Judicial Ethics, Canon 15; ABA Standards Relating to the Function of the Trial Judge, § 6.4 (Approved Draft, 1972); Conner, The Trial Judge, His Facial Expressions, Gestures, and General Demeanor—Their Effect on the Administration of Justice, 6 Am.Crim.L.Q. 175 (1968). Cf. *Commonwealth v. Brown,* 438 Pa. 52, 265 A.2d 101 (1970); *Commonwealth v. Watts,* 358 Pa. 92, 56 A.2d 81 (1948).

While it appears that, on the whole, the trial court's conduct of the trial was not biased, that fact does not detract from our conclusion that the appellant was seriously prejudiced by the court's question. See *Sarshik v.*

*Fink*, 292 Pa. 256, 141 A. 39 (1928). The fact that it was the defendant himself in the present case who was the target of the judge's incredulity serves only to magnify the potential harmful effect upon the jury. As we stated in *Myma, supra*: "An expression of . . . condemnation is quickly reflected in the jury box . . . . It has the tendency to take from one of the parties the right to a fair and impartial trial." We are satisfied that this is such a case.

Judgment of sentence reversed and a new trial ordered.[8]

EAGEN, O'BRIEN and NIX, JJ., concur in the result.

JONES, C. J., dissents.

8. In light of our disposition of the case we need not consider appellant's other allegations of error. These are: (1) that the court erred in refusing to suppress appellant's confession because allegedly obtained during a period of unnecessary delay between arrest and arraignment and involuntarily obtained; (2) that the prosecutor made inflammatory remarks to the jury; (3) that the court erred in instructing the jury; and (4) that he was denied due process because the jury could infer from the evidence that appellant had taken and failed a polygraph examination.