J-A26001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JAMES M. SMITH :
:
Appellant : No. 2456 EDA 2019

Appeal from the Judgment of Sentence Entered May 22, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0000030-2017

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED:  DECEMBER 31, 2020**

Appellant, James M. Smith, appeals from the May 22, 2019 judgment of sentence of 60 to 180 months' incarceration, followed by 36 months' probation, imposed after a jury convicted him of three counts of unlawful contact with a minor, criminal attempt to commit involuntary deviate sexual intercourse, criminal attempt to commit aggravated indecent assault, criminal attempt to commit statutory sexual assault, and criminal use of a communication facility.[1]  On appeal, Appellant alleges that the court erred in denying his request for a mistrial after the court improperly questioned him

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 6318(a)(1), 18 Pa.C.S. §§ 901(a)/3122(a)(7), 18 Pa.C.S. §§ 901(a)/3125(a)(8), 18 Pa.C.S. §§ 901(a)/3122.1(b), and 18 Pa.C.S. § 7512, respectively.

during his direct-examination, and that his lifetime registration requirement as a Tier III offender under Subchapter H of the Sexual Offender Registration and Notification Act ("SORNA II")[2] is unconstitutional.[3]  After careful review, we vacate the portion of Appellant's judgment of sentence deeming him a Tier III offender under SORNA II, and remand for further proceedings consistent with this memorandum.

The trial court summarized the facts and procedural history of Appellant's case, as follows:

> [A]ppellant was the subject of a child exploitation investigation conducted by the Office of the Attorney General [(OAG)].  The investigation ended when ... [A]ppellant arrived at the Little Lehigh Parkway expecting to meet a thirteen[-]year[-]old child, but instead, met undercover agents of the [OAG] who arrested him.  The arresting officers included the undercover agent who had been communicating with ... [A]ppellant while assuming the identity of a thirteen (13) year old named "Marisa."

---

[2] 42 Pa.C.S. §§ 9799.10-9799.42 and 42 Pa.C.S. §§ 9799.51-9799.75, respectively.

[3] Following ***Commonwealth v. Muniz***, 164 A.3d 1189 (Pa. 2017), and ***Commonwealth v. Butler***, 173 A.3d 1212 (Pa. Super. 2017) ("***Butler I***"), *rev'd*, 226 A.3d 972 (Pa. 2020) ("***Butler II***"), the Pennsylvania General Assembly amended the prior version of SORNA ("SORNA I") by enacting Act 10 on February 21, 2018, and Act 29 on June 12, 2018, which are collectively known as "SORNA II."  ***See*** Act of Feb. 21, 2018, P.L. 27, No. 10 ("Act 10"); Act of June 12, 2018, P.L. 140, No. 29 ("Act 29").  SORNA II now divides sex offenders into two subchapters: (1) Subchapter H, which applies to an offender who committed a sexually violent offense on or after December 20, 2012 (the date SORNA I became effective); and (2) Subchapter I, which applies to an individual who committed a sexually violent offense on or after April 22, 1996, but before December 20, 2012, whose period of registration has not expired, or whose registration requirements under a former sexual offender registration law have not expired.

A presentence report was ordered after the jury verdict, and a sentencing hearing was held on May 22, 2019. Prior to sentencing, [A]ppellant's counsel filed "Defendant's Motion to Bar Application of SORNA…." The motion was denied after argument at the time of sentencing.

… [A]ppellant was sentenced on the charge of [u]nlawful [c]ontact [w]ith a [m]inor ([c]ount 1) to not less than sixty (60) months nor more than one-hundred eighty (180) months in a state correctional institution, to be followed by a consecutive period of thirty-six (36) months['] probation. The sentence imposed for that charge was within the standard range of the Sentencing Guidelines.

Due to [A]ppellant's convictions for sexually violent offenses, he was required to register as a Tier III offender for life. He was not determined to be a sexually violent [predator].

On May 30, 2019, … [A]ppellant filed "Defendant's Post-Sentence Motions." The next day, "Defendant's Amended Post-Sentence Motions" were filed. Objections to the requirements of registration under … []SORNA[ II], as well as the sufficiency and weight of the evidence assertions, were included in that motion. … A hearing on that motion was held on July 29, 2019, and the post-sentence and amended post-sentence motions were denied.

A [n]otice of [a]ppeal was filed on August 23, 2019. On August 26, 2019, … [A]ppellant was directed to comply with Pa.R.A.P. 1925(b) (hereinafter [Rule] 1925(b) Statement). An "Application for Enlargement of Time…" to file his [Rule] 1925(b) Statement was filed on August 27, 2019. The motion was granted, and the timeframe for the filing of the [Rule] 1925(b) Statement was extended until October 29, 2019. On October 28, 2019, counsel filed a "Concise Statement of Matters Complained of on Appeal." [The trial court filed its Rule 1925(a) opinion on November 25, 2019.]

Background

On August 26, 2016, Special Agent Daniel Block, a member of the Child Predator Section of the [OAG], came across an advertisement on Craigslist which initiated this child exploitation investigation. The advertisement was construed by Agent Block as someone looking for a sexual encounter with a minor. Using his undercover e-mail, he responded to the sexual overture, and over the course of this investigation[,] assumed the cover-story

of a thirteen (13) year old female named "Marisa Syr," who had recently moved from St. Louis, Missouri, to this area.

Throughout the chats that were exchanged, there was never any doubt that a thirteen (13) year old was a participant. Agent Block testified that "[o]n multiple occasions[,] I actually said my age was 13."

The initial conversations used the Craigslist exchange, but then moved to Google Hangout, a chat platform. Appellant identified his e-mail address as "cdjamieisafreak@gmail.com." To uncover the individual to whom he was communicating, Agent Block secured Internet Protocol Numbers (IP address), and through a variety of investigative steps learned that it came back to the desk of … [A]ppellant at Talen Energy.

The sexual exchanges, some more explicit than others, lasted from August 26, 2016, to October 19, 2016. Agent Block explained that the person with whom he was communicating wanted to meet "go for a walk, kiss, cuddle. He wanted the purported child to wear a summer dress without underwear, and then more cuddling and possibly sexual contact would happen after that." During their conversations, "Marisa" said that she was a "virgin," and the response was that he had a "vasectomy." Their conversations evolved into meeting for a sexual assignation on October 19, 2016.

On October 19, 2016, at approximately 7:00 p.m., … [A]ppellant and "Marisa" arranged to meet at Little Lehigh Parkway. Agent Block arrived and observed … [A]ppellant's Toyota Corolla parked near the entrance to the park. Agent Block and Special Agent Eric Barlow entered the park and headed toward the anticipated meeting place. While doing so, they encountered … [A]ppellant, whom they recognized as the target of their investigation. … [A]ppellant was immediately taken into custody, verbally advised of his *Miranda*[4] rights, and explained the essence of the charges.

… [Appellant] was then transported to the OAG's Bureau of Narcotics Investigation (hereinafter BNI) Allentown office, placed in a conference room, and again advised of his *Miranda* rights. …

_____

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[A]ppellant executed a written *Miranda* form while at the BNI office.

    … [Appellant] was then interviewed by the agents. His background was explored, and more significantly, his contact with "Marisa" and his appearance at Little Lehigh Parkway. It was learned that … [A]ppellant, who was fifty-one (51) years old at the time of the trial, was a nuclear engineer at Talen Energy. He was initially reticent to discuss his sexual peccadillos, but eventually did so: He explained that "he had been looking for men and women on Craigslist for the last five years for sexual contact. He also stated that he recalled [] a minor child responding to one of his ads on Craigslist in August of 2016. He stated anyone who gives me attention, I also give them attention." A taped interview was completed with … [A]ppellant, which confirmed the details of the investigation. He admitted that his e-mail account was "cdjamieisafreak@gmail.com," and that he had posted an advertisement in August 2016. He also acknowledged that a person identifying herself as a thirteen (13) year old responded to the advertisement, and they exchanged messages with a sexual content. Finally, he admitted to arranging a meeting in the park for sexual contact with a thirteen (13) year old, and showed up at the park. He was, however, unsure if he would have gone through with sexual acts with a thirteen (13) year old. He also confessed to a sexual addiction, and did not discriminate about with whom he partnered.

    … [A]ppellant testified on his own behalf, and conceded that he had posted the advertisement on Craigslist[,] which initiated this investigation. Over a five[-]year period using Craigslist, he had communicated with "in the order of 100 to 150" people, met approximately twenty, and had sexual relations with "maybe a dozen."

    He also agreed that he received the response from "Marisa" on August 26, 2016. During their extensive communications, "Marisa" identified herself as a thirteen (13) year old, but … [A]ppellant claimed his reaction was "disbelief." Even so, the communications continued, and … [A]ppellant began what he described as a "quest" to identify the other party to their chats. Throughout the entire period of their communication, August 26, 2016, to October 16, 2016, … [A]ppellant denied that he believed he was speaking with a thirteen (13) year old. He described the graphic sexual content of his conversations as a "fantasy conversation with an adult." Nonetheless[,] he continued to do

so, and agreed to meet the person whom he did not believe was a thirteen (13) year old in a secluded spot in Little Lehigh Parkway. He testified that his reason for doing so was to discover the "identify of the person I have been talking with for two months."

… [A]ppellant also created a "journal" (text messages to himself) regarding his suspicions about "Marisa." His purpose, so he testified, was "to organize thoughts and keep a record of what was going on, and [] try to get to the identity of the person."

Regarding his statements, … [A]ppellant contended that shortly after the interview commenced, Agent Block "badgered" him and used vulgar language. He asked Agent Block to leave the conference room, which he did. He maintained that he believed his conversations were not with a child, and his statements were the product of fear that the agents would descend upon his home and his neighbors.

Various character witnesses were also presented by the defense, including neighbors, fellow employees at Talen Energy, and people he met through the Boy Scouts or their children's sports activities. However, some of those witnesses backtracked on their character testimony upon learning that … [A]ppellant was having graphic sexual conversations with someone posing as a thirteen (13) year old.

Trial Court Opinion (TCO), 11/25/19, at 1-7 (footnotes omitted).

On appeal, Appellant states the following issues for our review:

A. Whether the … trial court should have granted [A]ppellant's request for a mistrial after the trial judge questioned the [A]ppellant in an adversarial tone[,] which conveyed to the jury the impression that the judge did not believe his testimony[,] thereby undermining his credibility?

B. Whether SORNA [II] is unconstitutional on its face and as applied to [A]ppeallant [*sic*], for the following reasons:

1. Whether SORNA [II] denies the [A]ppellant due process under the Pennsylvania Constitution because it creates an irrebuttable presumption that those convicted of enumerated offenses "pose a high risk of committing additional sexual offenses[,]" depriving those individuals of their fundamental right to reputation without notice and an opportunity to be heard?

2. Whether SORNA [II] denies … [A]ppellant procedural due process under the fifth and fourteenth amendments to the United States Constitution because it unlawfully restricts liberty and privacy without notice and an opportunity to be heard?

3. Whether SORNA [II] violates substantive due process under the state and federal constitutions, U.S. Const. Amend. XIV; Pa. Const. Art I, §1, because SORNA [II] deprives individuals of unalienable rights and fails to satisfy strict scrutiny?

4. Whether the recent amendment to SORNA [II] is in all material respects identical to SORNA [I] and therefore a punitive law?

5. Does SORNA [II,] as a penal law, violate the separation of powers doctrine because it usurps the exclusive judicial function of imposing a sentence?

6. Whether SORNA [II] contravenes the 5th, 6th and 14th amendments of the United States Constitution and the corresponding protections of the Pennsylvania Constitution because as a criminal punishment, SORNA [II] cannot be imposed without due process, notice and opportunity to contest its imposition, and ensuring that each fact necessary to support the mandatory sentence and a sentence beyond the authorized statutory maximum is submitted to a jury and proven beyond a reasonable doubt pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000)[,] and *Alleyne v. United States*, 1570 U.S. 99 (2013)?

7. Whether the imposition of mandatory[,] lifetime sex offender registration for all Tier III offenses under SORNA [II] is a cruel and unusual punishment in violation of the eight[h] and fourteenth amendments to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution?

Appellant's Brief at 4-6 (unnecessary capitalization omitted).[5]

---

[5] Appellant filed an initial brief on May 5, 2020. On May 14, 2020, he filed an application to supplement his brief, which this Court granted by *per curiam* order. Appellant filed a supplemental brief on June 18, 2020. Any citation to Appellant's brief in this decision refers to his supplemental brief.

Appellant first challenges the trial court's denial of his motion for a mistrial, which he made in response to questions the court asked of him during his direct examination. As our Supreme Court has explained:

> It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Chamberlain*, 30 A.3d 381, 422 (Pa. 2011) (internal citations and quotation marks omitted).

Here, Appellant's request for a mistrial was made after the following portion of his direct-examination, during which Appellant testified about why he continued communicating with an individual claiming to be a 13-year-old girl:

> [Appellant:] Again, [I] was just wanting to find out who the other person was, wanting to continue on.
>
> [Defense Counsel:] Why didn't you just confront this person once and for all?
>
> [Appellant:] If you confronted the person, I mean, I saw previously, you know, confront, you know, try to confront them, it's just an adverse reaction, … and I really wanted to continue the conversation and find out who it was.
>
> THE COURT: How were you going to discover that? Was the person--

- 8 -

[Appellant]: I'm sorry?

THE COURT: How were you going to discover that? You're on -- we're now in October. You have been on since August. How are you going to discover who this person was if you haven't discovered it? What, did you think the person was going to suddenly admit on here, I'm a particular person?

[Appellant]: Well, as --

THE COURT: I mean, I don't quite understand your point as to how you expected the person was going to be uncovered through continuing this ruse, according to you, from August 26th to now we're at October 11th. I don't get it.

[Appellant]: Well, um -- so --

THE COURT: How do you -- how do you expect that you were going to discover who this person was?

[Defense Counsel]: Your Honor, may we approach for a moment?

THE COURT: No.

[Appellant]: Um, so I had obviously been continuing this discussion for several months, and it was becoming clear that, you're right, there was -- they were never going to voluntarily give up their identity. And at a certain point, my curiosity got -- drove me to say, Okay, I'm going to try to see a different way to find their identity.

THE COURT: Okay. Continue, [defense counsel].

N.T. Trial Volume II, 1/17/19-1/18/19, at 743-45.

A short time after this exchange, Appellant moved for a mistrial, arguing that the court had "expressed speculation about [his] veracity in front of the jury" by questioning him in the manner it did. *Id.* at 757. The court denied the motion, reasoning that nothing in the way it had questioned Appellant indicated to the jury that it was skeptical of Appellant's veracity. *Id.* Instead,

the court was simply attempting to clarify "how [Appellant] was going to discover the identity of this person…." ***Id.***

Now, on appeal, Appellant contends that the court's ruling was an abuse of discretion.[6] He insists that "[t]he [c]ourt acted in the manner of a prosecuting attorney rather than an impartial arbiter in the presence of the fact-finder." Appellant's Brief at 16. Appellant further argues that, "[b]y questioning … Appellant in such a skeptical manner, the trial court had questioned Appellant's credibility and the key to his defense." ***Id.*** "Since Appellant's state of mind was crucial to his defense," Appellant concludes that "the trial court's obvious disbelief of Appellant seriously prejudiced him." ***Id.*** at 19-20.

In rejecting this claim, the trial court explained:

> During the trial, [A]ppellant testified that his conversations with "Marisa," which spanned approximately fifty-four (54) days, were designed to uncover the identity of the person with whom he was communicating. This [c]ourt then asked … [A]ppellant how he intended to do so when, from August to October, he had been unsuccessful. … [A]ppellant, in response, agreed that the other person was "never going to voluntarily give up their identity," and he would try a "different way to find their identity."

_____

[6] We reject the Commonwealth's cursory assertion that Appellant has waived this issue by not immediately moving for a mistrial after the court's questioning. ***See*** Commonwealth's Brief at 10. The Commonwealth provides no argument in support of this claim, and cites only Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). However, Appellant did raise this claim before the trial court, and requested a mistrial, as discussed *supra*. While Appellant's motion for a mistrial was not instantaneous, it was made a short time after the court's at-issue questioning. Thus, we conclude that Appellant has preserved this issue for our review.

A few questions on that issue was the extent of the trial court's inquiry.

Pennsylvania Rule of Evidence (hereinafter Pa.R.E.) 614 codifies the common law rule and permits the trial court to "examine a witness regardless of who calls the witness" in the interests of justice. *See* Pa.R.E. 614(b). In that regard, the trial judge has the right, and, at times, the duty to "ask questions when absurd, ambiguous, or frivolous testimony is given or testimony is in need of further elucidation." *Commonwealth v. Carson*, 913 A.2d 220, 249 (Pa. 2006); *see also Commonwealth v. Lanza*, 323 A.2d 178, 179 (Pa. Super. 1974) ("A trial judge has an inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information.").

The testimony of … [A]ppellant needed "elucidation" regarding how he intended to discover the identity of "Marisa," when he had been unsuccessful from August to October. The questions were brief and limited to that issue. Nothing could be further from the truth than [A]ppellant's claim that the questions were "blatantly adversarial." A mistrial was denied, and a new trial is not warranted because the questioning of … [A]ppellant was not prejudicial. It was not of "such nature or substance or delivered in such a manner that it may reasonably be said to have deprived the [Appellant] of a fair and impartial trial." *Commonwealth v. Manuel*, 844 A.2d 1, 9 (Pa. Super. 2004) [(]quoting *Commonwealth v. Purcell*, 589 A.2d 217, 223-24 (Pa. Super. 1991)[)].

In *Commonwealth v. King*, 549 A.2d 195 (Pa. Super. 1988) (collecting cases), the role of the trial judge was explained this way:

> A courtroom is a court of justice and not just a battleground for the tilting of attorneys or a testing of their wits and oratory[;] … to so limit it would often jeopardize or defeat justice. It is the purpose of a criminal trial to ascertain the truth, and it is the business of the trial judge to see that the end is obtained. Thus, it is proper for the trial court to ask questions about facts which did not appear from either counsel's examination of the witness.

*Id.* at 197 [(internal citations omitted)].

Finally, the jury was instructed that "if [the court] ask[ed] any questions of a witness, [the jury] should not interpret those

- 11 -

questions as favoring one side or the other. Remember, [the jury] decide[s] the facts and questions that [the court] might ask are designed to clarify issues or questions that you might have about the facts or circumstances." The inquiry by this [c]ourt was not error.

TCO at 23-25 (footnotes omitted).

Based on the court's discussion, the record, and pertinent case law, we discern no abuse of discretion in the court's decision to deny Appellant's request for a mistrial. First, as the Commonwealth points out, the trial court asked questions of other witnesses who testified prior to Appellant. *See* Commonwealth's Brief at 15 ("[T]here were many other occasions during trial when the trial court asked questions of witnesses for the purpose of clarifying their testimony.") (citing N.T. Trial Volume I, 1/15/19-1/16/19, at 282-83, 290; N.T. Trial, 1/17/19, at 563 , 579, 619, 628-32, 638, 639). Second, when the court questioned Appellant, it asked only a few questions, which were framed to clarify Appellant's testimony about how he planned to discover the identity of the person to whom he was speaking. Third, the questions asked by the court did not, in and of themselves, suggest that the court disbelieved Appellant's testimony. To the extent Appellant claims that the court spoke with an incredulous tone, we must accept the court's indication that it did not, as the cold record does not demonstrate otherwise. *See* N.T. Trial Volume II at 757.

As a whole, the facts of this case make it distinguishable from the decision relied upon by Appellant, *Commonwealth v. Williams*, 364 A.2d 281 (Pa. 1976). There, the trial court questioned Williams about why he did

not ask for a lawyer during his interview with police, even when the officers had allowed Williams to call his sister. *Id.* at 285. Notably, when Williams explained that he had not told his sister to get him a lawyer because the officers were standing right there listening, the court quipped, "did they have a gun against your back?" *Id.* In concluding that Williams deserved a new trial, our Supreme Court reasoned that "[t]he judge's reference to a gun at [Williams'] back indicated quite clearly to the jury the judge's own disbelief of [Williams'] allegations that he had not been advised of his constitutional rights and that he had been denied his right to speak with a lawyer." *Id.* at 285-86.

Unlike in *Williams*, the questions posed to Appellant by the trial court were not "so partisan in nature" as to have caused prejudice to Appellant. *Id.* Indeed, we agree with the Commonwealth that,

> the trial court's brief questions to [Appellant] seeking clarification were to his advantage. The trial [court] prompted [Appellant] to resolve, in his favor, an apparent inconsistency in his exculpatory story. The jury could have equally construed this as acceptance, rather than skepticism, on the part of the trial [court].

Commonwealth's Brief at 15. We also conclude, as did the trial court, that any minimal prejudice resulting from the court's questions was cured by the court's instruction that its questioning of witnesses should not be interpreted as favoring one side or another. Accordingly, Appellant is not entitled to a new trial.

Appellant's next issue challenges the constitutionality of SORNA II. He contends, *inter alia*, that SORNA II automatically applies a false, irrebuttable presumption that sex offenders pose a high risk of reoffending, which deprives

registrants of their right to reputation without notice and an opportunity to be heard. He also claims that SORNA II is still punitive and contrary to the rules set forth in *Apprendi/Alleyne*, despite the amendments made to SORNA I. Appellant also avers that SORNA II constitutes cruel and unusual punishment.

Appellant's arguments are identical to those recently addressed by our Supreme Court in *Commonwealth v. Torsilieri*, 232 A.3d 567 (Pa. 2020), and this Court in *Commonwealth v. Mickley*, --- A.3d ----, 1258 EDA 2019, *2 (Pa. Super. filed Sept. 24, 2020). In *Mickley*, we explained:

> The *Torsilieri* Court did not reach the merits of any of the constitutional claims at issue, determining instead that the factual record was not sufficiently developed in the trial court. The Court concluded a remand was appropriate "to allow the parties to address whether a consensus has developed to call into question the relevant legislative policy decisions impacting offenders' constitutional rights." *Id.* at 587. The Court stated:
>
> > We recognize that the Commonwealth parties relied upon our recent statement in *Muniz*, rejecting [ ] expert evidence calling into question the legislature's assessment of sexual offender recidivism risks and the effectiveness of tier-based registration systems. In light of this reliance, we emphasize that all cases are evaluated on the record created in the individual case. Thus, a court need not ignore new scientific evidence merely because a litigant in a prior case provided less convincing evidence. *Indeed, this Court will not turn a blind eye to the development of scientific research, especially where such evidence would demonstrate infringement of constitutional rights.*
> >
> > Nevertheless, we also emphasize that it will be the rare situation where a court would reevaluate a legislative policy determination, which can only be justified in a case involving the infringement of constitutional rights and a consensus of scientific evidence undermining the legislative determination. We reiterate that while courts are empowered to enforce constitutional rights, they should

- 14 -

> remain mindful that "the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements."
>
> * * *
>
> Accordingly, we conclude that the proper remedy is to remand to the trial court to provide both parties an opportunity to develop arguments and present additional evidence and to allow the trial court to weigh that evidence in determining whether [the Commonwealth] has refuted the relevant legislative findings supporting the challenged registration and notification provisions of Revised Subchapter H.

*Id.* at 596 (emphasis added) (citations omitted).

> Here, despite defense counsel's attempt, no evidence was presented at the hearing on Mickley's post-sentence motion. Thus, in accordance with ***Torsilieri***, we vacate the order denying Mickley's post-sentence motion and remand for a hearing at which the parties can present evidence for and against the relevant legislation determinations discussed above.

***Mickley***, 1258 EDA 2019, at *4-5.

Here, as in ***Mickley***, Appellant proffered no evidence to support his challenges to SORNA II. Therefore, we vacate the order denying Appellant's post-sentence motion and remand for a hearing consistent with ***Torsilieri*** and ***Mickley***. We affirm Appellant's judgment of sentence in all other respects.

Judgment of vacated in part, affirmed in part. Case remanded for further proceedings. Jurisdiction relinquished.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/31/20